Lori OBERSON, Legal Guardian for Brian Musselman, an incapacitated person, and Kimberlee Musselman, Individually and as Natural Mother of Devon Musselman, a minor, Plaintiffs,

v.

UNITED STATES of America; acting through the U.S. Department of Agriculture, Forest Service, and Does A–Z, inclusive, Defendant.

and

United States of America, Third–Party Plaintiff,

v.

Jamie Louis Leinberger; Patrick B. Kalahar; and Tim A. Johnson, Third–Party Defendants.

Lori Oberson, Legal Guardian for Brian Musselman, an incapacitated person, and Kimberlee Musselman Individually and as Natural Mother of Devon Musselman, a minor, Plaintiffs,

v.

State of Montana, by and through the Department of Fish, Wildlife, and Parks; West Yellowstone Chamber of Commerce, Does A–Z, inclusive, Defendants,

and

State of Montana, Plaintiff,

v.

United States of America, Third–Party Defendant.

Nos. CV 99–48–BU–DWM, CV–99–55–BU–DWM.

United States District Court, D. Montana, Butte Division.

Jan. 23, 2004.

Tom L. Lewis, J. David Slovak, Lewis, Huppert & Slovak, Great Falls, MT, Andrew D. Huppert, Attorney at Law, Missoula, MT, for plaintiffs.

Bernard F. Hubley, Deanne Sandholm, Office of the U.S. Attorney, Helena, MT, William Evan Jones, Lucy T. France, Garlington, Lohn & Robinson, PLLP, Missoula, MT, Gig A. Tollefsen, Berg, Lilly & Tollefsen, Bozeman, MT, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOLLOY, Chief Judge.

### I. INTRODUCTION

On February 25, 1996, 35–year–old Brian Musselman was involved in a snowmobile accident on a snowmobile trail north of West Yellowstone, Montana, which caused him catastrophic brain injuries. Musselman was an expert snowmobiler who had been inducted into the Michigan Snowmobile Hall of Fame. His entire life was involved with snowmobiles. In addition to racing, he was an executive of a family-owned business that designed, developed and manufactured parts and devices for production snowmobiles as well as racing snowmobiles. He was earning nearly $350,000 a year. As a result of this devastating accident, he went from being a robust, energetic business executive and expert snowmobile racer to being a helpless human form, unable to care for himself in any manner, confined to feeble grunting and interminable days of expensive medical care and treatment.

Lori Oberson, legal guardian of Brian, and Kimberlee Musselman, natural mother of Brian's daughter Devon Musselman, brought this suit against the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* alleging negligence on the part of the United States for failing to correct or warn of an allegedly dangerous trail condition on the groomed snowmobile trail where Musselman was injured. The Unit-

ed States filed a third-party complaint against Jamie Louis Leinberger, Patrick B. Kalahar, and Tim A. Johnson alleging that their negligence caused Musselman's injuries. Default was taken as to Tim Johnson. Patrick Kalahar settled with the Plaintiffs prior to trial and was dismissed by this Court.

A bench trial was held January 7–15, 2002. After considering the evidence and testimony submitted at trial, along with the parties' arguments and proposed findings of fact and conclusions of law, I find the following parties negligent: Brian Musselman, 10%; Jamie Leinberger, 50%; U.S. Forest Service, 40%. I find that Brian Musselman was damaged in the amount of $11,296,800 and that Devon Musselman was damaged in the amount of $600,000. Consequently, Brian Musselman's damages are reduced by $1,129,680, leaving damages caused by others in the amount of $10,167,120. Of that amount, the Forest Service is obligated to pay Musselman $4,518,720, while Leinberger is obligated to pay him $5,648,400. Furthermore, under Montana law the Forest Service is obligated to pay $266,666.67 of damages to Devon Musselman, and Leinberger is obligated to pay her $333,333.33.

My decision is based on the following Findings of Fact and Conclusions of Law.

## II. FINDINGS OF FACT

1. Brian Musselman, a resident of Michigan, was born on March 13, 1961. He was married to Kimberlee Musselman (Beam) and is the father of their daughter, Devon Musselman, who was five years old at the time of the accident. Devon was born on November 7, 1990.

2. Musselman was an expert snowmobiler, and was inducted into the Michigan Snowmobile Racing Hall of Fame in 1998. Vol. IV 214:7, 217:1–5, 220:16–17.

3. Patrick Kalahar, Jamie Leinberger and Tim Johnson are also residents of Michigan, and were with Musselman at the time of the accident. All three were accomplished snowmobilers. Vol. I 42:17–24, 115:22–25. Leinberger Depo 7:6–16.

4. On Friday, February 23, 1996, Musselman and Kimberlee traveled with a group of friends from their home in Michigan to West Yellowstone, Montana, to snowmobile in the surrounding area.

5. On Saturday, February 24, 1996, the group rented snowmobiles from Westgate Station in West Yellowstone, Montana. Vol. I 118:1–4. The group then split up into smaller groups, with most members snowmobiling in Yellowstone National Park. There is no evidence that any of the group members rode the Big Sky Trail or the accident site on Saturday the 24th.

6. On Sunday, February 25, 1996, the riders again separated into small groups and rode both in the Park and in the Gallatin National Forest. Vol. IV 148:3–24; Vol. I 44:7–20, 119:24–120:20. They did not ride the Big Sky Trail during the day on February 25, 1996. Vol. I 44:7–20, 119:24–120:20, 121:5–7.

7. After returning to West Yellowstone, Brian and Kim Musselman shopped for about an hour, after which they came back to the hotel and sat in the hot tub. Vol. IV 148:22–149:16. Musselman drank one or two beers, after which he returned to his room and took a nap. Vol. IV 149:17–150:1. After waking, he drank a Diet Coke. Vol. IV 150:2–6.

8. The group gathered later in the evening to travel to Eino's, a restaurant approximately 8½ miles north of West Yellowstone. The men rode their snowmobiles to Eino's, while the women took a shuttle. Vol. IV 150:7–12. It was dark when the snowmobilers left West Yellowstone for Eino's. Vol. I 122:12–22.

9. Musselman, Johnson and Kalahar rode together to Eino's via a groomed

snowmobile trail managed by the U.S. Forest Service, the Big Sky Trail. Vol. I 47:23–51:21. The trail crosses Cougar Creek just south of the accident site. This crossing forced the snowmobilers to ride their machines onto the highway shoulder at this point. Musselman, Kalahar and Johnson stayed on the shoulder of the highway for the short distance remaining to Eino's and completely bypassed the accident site. Vol. I 48:8–18, 49:20–50:3, 51:11–52:2. Musselman, Johnson & Kalahar were riding competitively on the way to Eino's, at speeds in the low 50s to upper 60s. Vol. I 73:1–75:15, 76:11–12, 77:7.

10. At Eino's, the three men joined their group, which numbered about 20. They cooked steaks, drank beer, and told stories. Vol. I 53:20–54:20.

11. At about 10:00 p.m., the group left Eino's. Musselman and Johnson were the first to leave on their machines, followed by Kalahar and Leinberger, among others. Vol. I 56:24–57:22. They left Eino's, crossed Highway 191, entered the Big Sky Trail and proceeded southbound toward West Yellowstone, Montana. Vol. I 157:25–158:9. No one in the party had ever traveled this portion of the trail between Eino's and Cougar Creek.

12. Leaving Eino's, riders cross the highway, then come to a stop before climbing the highway cut to get to the trail system. They then turn and ride between a fence and the highway to where Duck Creek crosses the trail. Riders then get up on the highway, stop, cross the road culvert and drop back down. They then climb up a plowed road with another stop sign, cross the plowed road, and follow the trail, which is flat, smooth, and essentially parallel to the highway, for about a quarter of a mile until they get to the accident site. Vol. I 215:21–217:17; Vol. III(ML), 797:13–798:9; Ex. 1004.

13. According to Johnson, he and Musselman took off, and then Musselman "sped away," and Johnson lost sight of him. Vol. I 131:1–5. Johnson testified that his machine accelerated more slowly than Musselman's, and that he "backed off" his speed initially because his visibility was reduced by the snowdust from Musselman's machine. Vol. I 131:7–132:12. Johnson then resumed his speed. Vol. I 131:22–24. Although he does not recall his exact speed, he testified that the 440 Polaris he was riding was capable of going in the mid–50s. Vol. I 118:5–12. He also testified credibly that he was in control of his snowmobile. Vol. I 139:13–20.

14. The accident occurred about 1 3/4 miles south of Eino's. Ex. 1004(map). Johnson testified that he did not slow down as he approached the hill because he didn't know it was there. Vol. I 139:9–12. He testified that he was "going along and all of a sudden, like I say, the bottom dropped out and I remember going through the air. I hit the ground pretty hard; it knocked the wind out of me. And I coasted up the trail through some thicket there and ended up next to the highway." Vol. I 135:15–19.

15. Forest Service law enforcement officers were notified of the accident at 10:30 p.m. Vol. II 454:12–455:4.

16. The Big Sky Trail is a heavily trafficked snowmobile trail that is the primary route by which snowmobilers ride to West Yellowstone from the north. The hill where Musselman was injured is about eight miles north of West Yellowstone, just north of Cougar Creek. The trail runs parallel to Highway 191, just east of the road. The road is visible from the trail.

17. The West Yellowstone trail system is "very well-signed." Vol. II 287:16. The trails are signed with stop signs, "stop ahead" signs, and speed limit signs, as well as signs warning of hazards identified by the Forest Service in its "warranting" process, junction signs informing people that

the trail will be changing, and "reassurance markers" that tell nighttime riders they are still on the trail. Ex. 1004(map); Vol. II 424:20–25. If the trail goes through a gate, the gate posts are signed with "object open" markers so that snowmobilers don't hit a post that may be buried in the snow. Vol. II 426:8–13.

18. The hill precipitously drops 17 feet over approximately 80 feet. Vol. II 273:23. This equates to an 11.5 degree pitch, Vol. III 581:12, or a 25 percent slope.

19. The last quarter-mile of the trail heading south toward the accident site is primarily straight, flat and groomed, with no significant curves. Vol. I 135:11–13, 199:3–15. Kalahar described it as "pure flat, flat-running, very smooth." Vol. I 58:24–25. The trail had just been groomed that night. Vol. II 415:11–14.

20. Musselman negotiated the hill on his snowmobile and landed safely just west of the trail at the bottom of the hill. Ex. 28. Johnson was next over the hill, and his sled crashed, although he did not fall off of his sled. Musselman got off of his sled, perhaps to assist Johnson or warn the coming riders, and began walking or running back across the trail. Vol. V 99:17–100:4, 108:17–109:10. At that instant, Kalahar and Leinberger came flying over the hill side by side. One of them hit Musselman in the head, causing catastrophic brain injuries.

21. Kalahar's snowmobile became airborne as he crested the hill. Vol. I 61:9–11. Kalahar was going faster than Leinberger and flew past him in the air. Vol. I 97:5–11. He clamped on the brakes, which caused his skis to tilt down, but he could not control the sled because he was not on the ground, and crashed. Vol. I 62: 7–13. He was not injured, but his sled was damaged. Vol I 62:17–63:2.

22. Kalahar admitted that he saw the 45 mph speed limit signs on the trail. Vol. I 69:10–14. He estimated that he was traveling 50–55 mph as he approached the hill. Vol. I 70:2–3. Leinberger testified that he was traveling about 55 mph at the time he reached the hill, at "full throttle," and was being passed by Kalahar at the time of the accident. Depo. Leinberger 61:6–62:3. Kalahar was passing Leinberger as he crested the hill. Vol. I 60:6–8, 95:5–7; Depo. Leinberger 57:5–14, 145:16–19. He was going faster than Leinberger, and flew past him in the air. Vol. I 97:5–11. Leinberger's sled tumbled and crashed. Vol. VI 146:7–15, 147:2–9.

23. Johnson testified that visibility going over the hill was "clear." Vol. I 136:14–17; 152:14–153:9. Kalahar testified to the same, Vol. I 112:23–24, although Leinberger testified that his visibility was hampered by snowdust from Johnson's machine. Depo. Leinberger 65:2–7. Kevin Breen, the government's expert on human factors and accident reconstruction, testified that Kalahar and Leinberger were likely traveling in Johnson's snow dust, and that their attention would have been distracted by the passing maneuver going on between them as they crested the hill. Vol. VI 114:3–11.

24. After being hit, Musselman was lying on the groomed portion of the trail between his sled and Leinberger's sled, with his head facing south, away from the hill. Ex. 28; Depo. Leinberger 67:23–25; Vol. I 168:13–19. Kalahar, whose sled traveled farther than Musselman's and Leinberger's, first went to check on Leinberger, and then went to Musselman. Vol. I 63:13–24. Kalahar described Musselman as having no abrasions or visible blood, but said he was struggling and gurgling. Vol. I 64:1–7.

25. Musselman's snowmobile was located beyond the bottom of the hill immediately to the west side of the groomed portion of the trail. Ex. 28 (diagram); Vol. 467:11–473:21. Terry Smith, a Forest

Service accident investigator who was one of the first responders that night, determined the path of Musselman's machine based upon tracks in the snow leading to the machine. Vol. II 472:7–22, 453:10. The machine sustained no damage whatsoever. Vol. III 735:13–15, 736:6–737:15; Vol. II 525:11–19.

### A. Accident Investigation

26. Forest Service law enforcement officers Mark Reinking and Terry Smith arrived at the scene shortly after the accident. Reinking, a law enforcement officer for the Idaho Panhandle National Forest on two-week special detail to the Hebgen Lake District, was in charge of the initial investigation. He prepared and submitted the official Forest Service Report of Investigation which documents the investigative efforts and findings. Ex. 28.

27. Although Officers Smith and Reinking were on the scene shortly after the accident, the investigation was poorly conducted. Officer Smith took notes that night, but has since lost them. Vol. II 456:11–15. They took only two photographs of the scene that night, but no photographs of any of the individuals involved, and no measurements that night. They did not secure the area to prevent the snowmobiles from being moved. Vol. II 503:12–16. They did not interview any witnesses that night, or if they did, they have lost their notes of the interviews and have no independent recollection of what was said. They ordered a blood sample drawn from Brian Musselman but left it in a refrigerator for three days, rendering it useless. Vol. IV 100:7–102:3. They did not order blood drawn from Kalahar, Leinberger or Johnson. They did not return to Eino's to interview witnesses about the party's alcohol consumption or behavior. Vol. II 535:20–536:1.

28. In fairness to the officers involved, they had just returned from investigating an avalanche fatality when they received the call about the Musselman accident. Vol. II 509:8–13. Undoubtedly they were tired. Nonetheless, the lack of evidence from the scene of the accident has made subsequent determination of what occurred that night far more complex than it otherwise would have been.

29. In addition, Officer Reinking testified that he contacted the Forest Service claims department early on in the investigation because of comments he overheard at the accident site about the lack of signing at the hill. Vol. II 512:2–515:23. In fact, Reinking met with Forest Service claims agent Mickey McCorkle to go over his final report prior to filing it. Vol. II 517:20–518:2. In the end, the Forest Service investigation provides no answer to the question of who hit Musselman. Nonetheless, this type of "cooperative report," reflecting the Forest Service's awareness of the potential legal issues that might arise because of the accident and Musselman's catastrophic injuries, affects my perception of the investigative report's reliability.

30. Officers Smith and Reinking returned to the accident scene the morning after the accident to take photographs and measurements. Vol. II 523:12–20. Officer Smith testified that to the best of his knowledge, Musselman's snowmobile was in the same place as it was the previous night. Vol. II 470:24–471:4. Further, he noted that the tracks leading to Musselman's snowmobile indicate that his machine was not moved. Vol. II 504:8–23. He noted the possibility that Leinberger's snowmobile was moved. Vol. II 488:5, 504:4–7. Officer Robert Morton, who visited the accident site the day after the accident with Officers Reinking, Smith, and Walker testified that the tracks in the snow indicated Leinberger's machine had been moved about three feet west of the trail. Vol. III 733:13–734:25.

31. Smith measured the distance from the top of the hill to the bottom of the hill at 73 feet. Ex. 28. He measured Leinberger's snowmobile 162 feet from the crest of the hill, and Musselman's snowmobile 192 feet from the crest. Vol. II 470:12–14, 471:9–12; Ex. 28, 9. He also took measurements from the top of the hill to the location of windshield parts found by the investigators, but he never matched the windshield pieces to particular machines. Vol. II 469:20–470:6. There is no measurement of where Johnson's machine landed, as he rode his machine back to West Yellowstone after the accident. However, his testimony indicates that he landed at the bottom of the hill and coasted toward the highway, then turned around and returned to find Musselman injured. Vol. I 137:3–7.

32. Kalahar's and Leinberger's machines sustained major damage. Ex. 28 (photos and diagram). Leinberger's sled was just north of Musselman's, on the west side of the trail, and still in the groomed part of the trail. Ex. 28. Forest Service investigator Robert Morton inspected Leinberger's snowmobile at the scene, and later at the rental shop. He noted that it suffered extensive damage to the front end, the windshield, handlebars, tunnel area, the skis, cowling, rear bench rest and motor mounts. Vol. III(ML) 749:6–12, 754:10–758:20. Officer Morton also inspected Kalahar's machine and testified that the "tunnel had been sprung," the motor mounts were broken and, as a result, the motor was twisted, the windshield was damaged, and the handlebars were bent. Vol III(ML) 752:7–14, 758:24–763:22.

33. Johnson was the only rider to ride his machine back to the motel that night. No investigator looked at Johnson's machine the night of the accident. The next morning, Johnson bought and installed a new windshield and louver. Vol. I 144:3–

16. Johnson testified that he hit the windshield and damaged it. Vol. I 168:23–169:1. According to the rental agreement, the windshield and louver were damaged when Johnson rented the machine; however, Johnson testified that the windshield had a small crack in it when he rented it, and a "big chunk out of it" after the accident. Vol. I 179:17–22. Rather than pay the deductible, he decided to fix it himself. Vol. I 180:3,184:7–9. I find his explanation credible.

34. No one was ever cited in connection with this accident. Vol. II 532:20–22.

### B. Injuries

35. Bonnie Gafney, a certified EMT and supervisory park ranger for Yellowstone National Park, was one of the emergency responders to arrive on the scene. Vol. V 85:17–18. Gafney is certified to provide advanced life support, and responded under a mutual aid agreement between the Park and West Yellowstone. Vol. V 85:10–13. Upon arriving, she asked who was most seriously injured, and was directed to Musselman. Vol. V 85:21–24. She testified that Musselman was unconscious and unresponsive, and "appeared to be seriously injured." Vol. V 86:19–21. After getting Musselman into the ambulance, Gafney observed labored breathing, clenched teeth, and bruising on the forehead and under the eyes. She concluded that he had a serious closed head injury. Vol. V 88:7–15.

36. Musselman was transported by ambulance to West Yellowstone, and flown by helicopter to the Eastern Idaho Regional Medical Center in Idaho Falls, Idaho. Leinberger suffered a severe hip injury requiring subsequent surgery. He was transported by ambulance from West Yellowstone to a relay point in Idaho, then transported to Eastern Idaho Regional Medical Center in Idaho Falls, Idaho. Kalahar suffered an ankle injury and was

transported by ambulance with Musselman to West Yellowstone and thereafter by ambulance to the Idaho facility with Leinberger. Johnson suffered no injury requiring medical attention.

37. There were no eyewitnesses to the accident. However, paramedics Alan Harper and Bonnie Gafney testified that, at the scene, Kalahar stated that he had seen Musselman walking or running towards the hill. Vol. V 99:22–100:4, 108:17–109:10. Gafney also testified that Kalahar said he had seen Musselman park his sled on the side of the trail and get off, and while he was walking towards the hill, another snowmobile hit him in the head. Vol. V 94:6–9, 99:17–100:4.

38. All witnesses agree that Musselman was first over the hill, with Johnson following right behind, and Kalahar and Leinberger coming over essentially together a few moments later. Johnson did not think he hit Musselman because he was the only one who rode his snowmobile back to West Yellowstone, and he stated that if he had hit Musselman, "I'd have known it." Vol. I 143:8–12, 166:7–20. Kalahar testified that he positively did not hit Musselman. Vol. I 100:21–24. Leinberger testified that he does not recall hitting Musselman because he "didn't hit an object that was going to move." Depo. Leinberger 71:2–16. Rider Bill Bourdow was following Leinberger from Eino's. He testified that he did not believe Leinberger could have hit Brian because he saw Leinberger's machine flipping and Brian lying flat. Depo. Bourdow 60:24–62:10.

39. Musselman's helmet was damaged. Ex. 1013. Kevin Breen, the government's human factors and accident reconstruction expert, testified that he found (1) black marks on the right rear part of the helmet consistent with the type and color of rubber used on snowmobile tracks; (2) a two-inch diameter crack encompassing the area of the marks; (3) similar cracking in a circular pattern on the opposite side of the shell; (4) cracking on the right side with paint missing; (5) pronounced cracking on the right side of the chin bar; and (6) similar cracking, but not as pronounced, on the left side. Vol. VI 105:20–107:1; Ex. 1013.

40. Breen's expert opinion based upon the damage to Musselman's helmet, his injuries, and the evidence is that (1) a snowmobile track hit Musselman's helmet while Musselman was in the trail, not on his snowmobile; (2) the impact came from the right to left side. Vol. VI 112:1–23. He also testified that Kalahar, Leinberger, or Johnson could have struck Musselman, and that it is impossible to determine which was more likely. Vol. VI 167:9–17.

41. Breen opined that there are two possibilities why Leinberger's snowmobile tumbled. One is that Leinberger applied his brakes before becoming airborne, which would have caused deceleration that forced the nose of his snowmobile down. Alternatively, Leinberger may have hit Musselman while airborne, which caused the nose of his snowmobile to go down and begin tumbling. Vol. VI 114:19–115:16. The evidence relating to Kalahar hitting Musselman is based on the alignment of the riders coming over the hill. If Leinberger and Johnson were on the same line and just missed Musselman, then Kalahar would be the only person who could have hit him. Breen testified that Kalahar's line of travel, based on where his snowmobile came to rest, is consistent with the line necessary to have contacted Musselman. Additionally, Kalahar's testimony that he hit the ground and bounced a second time is consistent with him hitting Musselman in the trail and then the ground. Vol. VI 115:17–116:12. Breen also testified that if the line Leinberger and Johnson were on was the line of travel necessary to hit Musselman, then Johnson

would have hit Musselman first. Based on the lack of evidence, Breen testified that he could not rule Johnson out. Vol. VI 117:9–22.

42. Based upon the testimony of Kalahar, Leinberger and Johnson, as well as expert testimony, I find it most likely that Musselman was first over the hill, and landed his snowmobile without injury to himself or damage to his machine. Johnson came over the hill next, probably going 50–55 mph, landed hard and headed away from the accident site toward the highway. Musselman then got off his machine, either to find out how Johnson was or to warn the coming riders of the steep hill, when he was hit by a snowmobile driven by either Kalahar or Leinberger.

### C. Alcohol

43. EMTs Gafney and Harper testified that they smelled alcohol at the scene. Vol. V 74:2–3; Vol. V 92:9–12. Gafney also testified that Musselman "smelled strongly of alcohol." Vol. V 98:8–12. Investigator Smith also smelled alcohol, but reported that he did not see anyone who appeared intoxicated. Vol. II 481:15–18, 481:23–482:13.

44. At Officer Reinking's request, EMT Gafney drew a blood sample from Brian Musselman at the scene of the accident. Vol. II 542:6–12. No blood was ever drawn from Kalahar or Johnson. Leinberger's blood was not drawn until 3 a.m., at which time his blood alcohol was .10. Vol. V 134:6–19. Musselman's blood alcohol at 1:35 a.m. was .03. Vol. V 121:5–123:11. For reasons explained below, Musselman's blood alcohol at the scene was never established. Furthermore, based on the events that took place and the expert opinions on the effects of alcohol, discussed *infra*, Musselman was not impaired at the time of the accident.

45. Gafney gave Musselman's blood sample to Bob Pearson, a deputy with the Gallatin County Sheriff's Office. Vol. V 98:13–21. Forest Service Special Agent Duane Moe testified that he obtained the sample from Pearson three days later, on Feb. 29, 1996, and transported it to the Eastern Idaho Regional Medical Center in Idaho Falls, Idaho. Vol. IV 100:7–20. The lab technician at the hospital would not test the blood because it had separated and could not be tested. Vol. IV 101:13–23. Moe testified that he did not refrigerate the blood. Vol. IV 101:8–10. The sample was never tested. Vol. IV 102:2–3. Consequently, the Court must look to both eyewitness and expert testimony to establish blood alcohol content of all four riders at the time of the accident.

46. Johnson testified that he consumed two beers at Eino's. Vol. I 157:3–5. Forest Service investigator Robert Morton testified that during his interview with Johnson, Johnson told him he consumed three or four beers while at Eino's. Vol. III 771:2–8, 789:22–790:9.

47. Kalahar testified that he consumed two beers at Eino's. Vol. I 54:18. Leinberger testified that he possibly consumed eight beers at Eino's, and regardless of how many he consumed, he felt impaired. Depo. Leinberger 50:22–51:22. During an interview with Forest Service investigator Duane Moe, Leinberger stated that he consumed four or five beers at Eino's. Vol. IV 104:12–14. Musselman drank a few beers at Eino's, and a shot of schnapps just before leaving the restaurant. Vol. IV 152:15–152:25.

48. Brian Hock, a member of Musselman's group, testified that Musselman's steak caught fire at Eino's, and Musselman dumped part of his beer on the steak to put out the fire. Depo. Hock 63:14–21. Hock sat with Musselman and Kalahar at dinner and saw them drink three or four Bud Lights. He remembered Kalahar buying the first round, Musselman buying the second, him buying a third round, and

testified there might have been a fourth. Depo. Hock 28:15–29:15. He stated that he saw Musselman and Kalahar "drink three for sure." Depo. Hock 63:9–13.

49. Investigator Reinking testified that he suspected alcohol was involved in the accident. Vol. II 549:13–15. He testified that he believed the whole group was drinking. Vol. II 556:4. However, he agreed that because Musselman safely negotiated the hill, drinking did not affect his ability to ride. Vol. II 555:22–556:8. Although Reinking agreed that interviewing employees at Eino's would have been a good idea, he never contacted anyone at Eino's to determine how much alcohol the members of the party had consumed. Vol. II 535:20–536:1.

50. Because the testimony about alcohol is equivocal, both parties presented expert testimony regarding Musselman's and Leinberger's blood alcohol. No expert testimony was given regarding Johnson's or Kalahar's blood alcohol content at the time of the accident; therefore, I must look solely to the testimony presented to make a finding about whether they were intoxicated and, consequently, impaired in a way that contributed to the causing the accident.

51. The government relied upon Dr. Richard Rech, a neuropsychopharmacologist, for expert opinion regarding blood alcohol content. Plaintiffs presented rebuttal evidence through Dr. Bryan Finkle, a forensic toxicologist. I found Dr. Finkle's testimony to be substantially more credible than Dr. Rech's. Dr. Finkle, the chief consulting toxicologist for the National Football League, is board certified as a forensic toxicologist and has published more than a hundred papers in peer-reviewed journals on the topic. He was the president of the International Association of Forensic Toxicologists for three years, and received the Rolla Hanger Award for outstanding lifetime achievement in foren-

sic toxicology. Vol. IV 2:4–5:22. His credentials are impeccable, and his testimony was clear and persuasive.

52. Both experts gave an opinion as to Musselman's probable blood alcohol content at the time of the accident based upon the blood alcohol reading of .03 at 1:35 a.m. Both experts assumed, based upon peer-reviewed literature, that a person's blood alcohol will begin to drop at an average rate of .02 per hour after they have stopped drinking. Both experts discounted the two beers Musselman drank prior to leaving the hotel for Eino's, because the alcohol would have been cleared from his body by the time he arrived at Eino's. Vol. V 132:8–11; Vol. IV 12:21–13:2.

53. Dr. Rech's error, as explained by Dr. Finkle, was to assume that the rising blood alcohol rate is the same as the falling blood alcohol rate. According to Dr. Finkle's expert testimony, the falling rate can be assumed because it is a linear constant, but the rising rate cannot because it depends on the rate of drinking, the persons's metabolism, and whether and what they were eating. Vol. IV 8:6–10:25. He also testified that intravenous fluids do not significantly change blood alcohol content over time, because the fluids migrate to the watery compartment of the body and do not stay in the blood. Vol. IV 23:26:7. I find Dr. Finkle's testimony highly credible and persuasive.

54. Dr. Finkle opined that Musselman's blood alcohol content was still rising at the time of the accident, given the evidence that he drank a shot of schnapps shortly before leaving Eino's and the scientific fact that blood alcohol rises for 45 minutes to an hour after the last drink is consumed. Vol. IV 11:1–8. He assumed that Musselman consumed two beers at Eino's, and a shot of schnapps just before leaving Eino's. Vol. IV 13:3–9.

55. Dr. Finkle testified that blood alcohol rises based upon factors including the rate of drinking, the size and weight of the person, and any food recently eaten. He further testified that while the slope of the rising curve varies significantly based upon these factors, the slope of the falling curve—the rate of alcohol clearance from the blood—is a relatively constant average of .02 percent per hour. Additionally, the maximum blood alcohol will occur within about an hour after the last drink is consumed. Vol. IV 8–10; 17:23–18:12.

56. Therefore, Dr. Finkle offered an opinion only as to Brian Musselman's maximum blood alcohol, which he assumed occurred at about 11:15 p.m., or one hour after the last drink. Vol. IV 11:11–21. In his expert opinion, Musselman's maximum blood alcohol, at about 11 p.m., would have been about .04. Vol. IV 13:20–25. Moreover, Dr. Finkle's testimony conclusively established that Musselman's blood alcohol would have been less than the maximum at the time of the accident, Vol. IV 26:3–7, although he made clear that he could not determine how much less it would be. Vol. IV 22:24–23:3. Thus, he opined that alcohol did not impair Brian Musselman that night. Vol. IV 27:21–28:8. Dr. Finkle did not offer an opinion about any possible impairment of Kalahar, Leinberger or Johnson.

57. Plaintiffs' human factors expert Robert Kennedy also expressed his opinion that alcohol did not impair Brian Musselman that night. Vol. III 601:21–22. He based his reasoning on Finkle's report. Vol. III 603:20–24. He testified that a blood alcohol of .03 to .06 would not affect a person's ability to perceive the slope of the approaching hill. Vol. III 604:1–18. I find this testimony credible and persuasive.

58. Dr. Rech opined that Leinberger's blood alcohol at the time of the accident was .215. Vol. V 135:6–22. He testified that a blood alcohol content of .09 would affect vision and judgment. Vol. V 139:1–3.

59. Dr. Finkle did not rebut Dr. Rech's testimony about Leinberger, although his rebuttal testimony regarding the effect of IV fluids on blood alcohol content is relevant. Nonetheless, even if Dr. Rech's overestimates Leinberger's blood alcohol, a preponderance of the evidence establishes that Leinberger was impaired by alcohol at the time of the accident.

60. Based upon the testimony of the parties regarding alcohol consumption, I find it more likely than not that Johnson and Kalahar were also impaired by alcohol, although not to the extent that Leinberger was.

61. As for Musselman, I find Finkle's testimony persuasive and conclude that Musselman's blood alcohol was about .03 at the time of the accident. The evidence persuades me Musselman was not drinking as much as the others. I further conclude, based on the fact that Musselman safely negotiated the hill as well as on expert testimony, that alcohol did not significantly impair Brian Musselman that night. Whatever Musselman's nominal blood alcohol was, his judgment was not impaired and he was fully able to operate his snowmobile.

### D. Speed

62. The Forest Service was aware as early as 1990 that high-speed riding—in excess of 60 mph—was taking place on the trails around West Yellowstone. Vol. I 204:24–205:22; Vol. III 673:11–19. In fact, that was one of the primary reasons the Forest Service created the initial warranting process. Vol. I 202:15–24, 203:15–17, 204:24–206:1.

63. The Forest Service is aware that the type of trails that encourage speed are straight, smooth, flat stretches. Vol. I 204:2–23, 214:13–215:7. The Forest Ser-

vice is also aware that well-groomed trails are conducive to higher speeds. Vol. I 204:21–23. The snowmobile trail maps indicated the days and times when trails would be groomed, and a recording at the groomer shed provided the same information to callers. Vol. II 416:2–21. The Forest Service also knows that curves in a trail tend to reduce speed. Vol. II 364:2–4.

64. Both Leinberger and Kalahar admitted they were traveling in excess of the speed limit, at 50–55 mph. Vol. I 61:6–62:3, 112:24–113:2. This is consistent with the damage done to their sleds. Rider Bill Bourdow testified that he was traveling about 35–40 mph from Eino's to the accident site. Bourdow Depo 50:2–8.

65. The testimony about Musselman's speed is much different. I find that he took off from Eino's quickly, and was riding fast enough to stay in front of everyone else. However, I also find that the evidence supports a finding that he was not going more than 45 mph as he came over the hill. That speed, while shown by the trial proof to be unsafe, is the speed limit posted by the Forest Service for this trail.

66. Richard Hermance, Plaintiffs' accident reconstruction expert, plotted the trajectory of a snowmobile coming over the hill at various speeds. Ex. 519; Vol. II 292:10–293:9. His projections were confirmed by the distances traveled by Forest Service employees attempting to recreate the accident. Vol. II 292:25–293:5. Hermance concluded that Musselman was probably going about 40–45 mph as he came over the hill. Vol. II 306:12–307:12. Even Defendant's expert Breen testified that Musselman could have been traveling less than 35 mph. Vol. VI 137:18–138:16.

67. Although the evidence as to the riders' speeds is conflicting, I find it likely that Musselman was riding within the speed limit as he crested the hill. I fur-

ther find by a preponderance of the evidence that Kalahar, Leinberger, and Johnson were traveling between 50–55 mph.

### E. The Hill

68. The hill over which the accident took place drops 17 feet over a 75– to 80–foot distance. Vol. II 273:14–23. This equates to an 11.5 degree grade, Vol. III 581:12, or a 25 percent slope. Vol. VI 42:25–43:1. The Forest Service planned on reducing the grade of the hill prior to the accident. Vol. I 241:12–243:1. As of the date of trial, it had not yet done so because of this lawsuit, but intends to once the case is over. Vol. I 245:17–25.

69. The trail runs directly parallel to Highway 191. Vol. I 216:5–24, 218:11–18. About a quarter mile north of the accident site, the trail and the highway are at the same elevation. Approaching Cougar Creek, both begin to drop in elevation. The road drops over a longer distance than the trail; therefore, the grade of the trail is much steeper than the grade of the road. The trail and highway converge again at Cougar Creek. Vol. III 799:22–800:13.

70. At the time of the accident there was no sign warning of the upcoming hill or telling riders to slow down. The posted speed limit was 45 mph. The speed limit was implemented in January 1996, a month before Musselman's accident. Ex. 18. It was the first time the Forest Service had ever placed a speed limit on the West Yellowstone trails. Vol. II 420:7–13.

71. Numerous witnesses established that the steepness of the hill was impossible to discern until the crest of the hill. Rider Bill Bourdow, who was following Leinberger from Eino's at 35–40 mph, did not recognize the hill until he was on the very top of the crest. Depo. Bourdow 60:24–62:10. Kathy Russell, a member of the Musselman party, went over the hill the morning after the accident and de-

scribed the sensation as a "tickle belly." Kathy Russell Depo 36:14–19. Tim Johnson testified that nothing indicated the approaching hill. Vol. I 141:16–19. Based on over 30 years of experience, Johnson testified that drop-offs of this nature are always signed. Vol. I 142:7–12. Kalahar testified that nothing alerted him of the upcoming hill. Vol. I 113:6–9. In 30 years of snowmobiling experience, he has encountered hills with similar types of grades, but has never encountered one on a groomed trail that was not marked. Vol. I 42:20–24, 61:16–22.

72. Even Forest Service witnesses confirmed the steepness and surprise of this hill. Officer Robert Morton rode over the hill the day after the accident at varying speeds. He testified that going over the hill at 50 mph "was a rush," and that he wouldn't want to do it again. Vol. III 777:11–778:11. Officer John Walker testified that based on his experience patrolling the West Yellowstone trail system, he could not recall seeing such an abrupt hill anywhere else on the groomed portion of the trails. Vol. III(ML) 785:25–787:8. Forest Service technician Ron Naber, who has ridden the entire 130 miles of the groomed West Yellowstone trail system every year for a number of years, said he is not aware of another hill on the system with a more abrupt slope that is not posted with a warning sign. Vol. II 414:5–415:7.

73. The government presented two witnesses who testified that the hill was manageable at 45 mph. I find the testimony of these two witnesses is not persuasive because of their interest in the case as well as the totally different circumstances of their experience riding over this hill as contrasted with the circumstances of the accident. I am more persuaded by the evidence presented by the government's videotaped reenactment, discussed next, and expert testimony interpreting that video.

### F. The Forest Service Video

74. A day or two after the Musselman accident, Forest Service investigator Robert Morton videotaped Officer Mark Reinking riding over the hill during the day at speeds of 35 mph, 45 mph, and 50 mph. Ex. 501; Vol. II 275:7–280:23. At 35 mph, the skis of the sled came off of the ground, but the sled remained under control. Vol. II 276:2–278:1. At 45 mph, the entire sled briefly lifted off of the ground, and the rider's body lifted up off of the seat. Vol. II 278:10–22. The same phenomenon occurred at 50 mph. I conclude a snowmobile traveling 10 mph less than the posted speed limit would unexpectedly leave the ground.

75. Richard Hermance, Plaintiffs' safety and reconstruction expert, is a certified snowmobile safety instructor, a technical advisor to the New York State Department of Parks and Recreation, a member of the New York State Snowmobile Safety Coordinating Group, a diplomat of the American Board of Forensic Examiners, a fellow of the College of the American Board of Forensic Examiners, consulted on the New York State Trail Design Manual, and has conducted extensive testing of snowmobile handling factors, including coefficients of friction, deceleration properties, acceleration properties and handling characteristics. Vol. II 267:9–271:15; Ex. 126. He has worked closely with numerous private and governmental entities dealing with snowmobile safety considerations. The United States has previously retained Hermance's services in the areas of snowmobile accident reconstruction and snowmobile safety, including the investigation of a snowmobile fatality near Yellowstone National Park. I found his testimony credible.

76. Hermance testified that the hill is a dangerous condition. The danger is proved in part by the Forest Service video

showing a snowmobile leaving the ground, the skis starting to flail, and the rider losing control of the machine at 35 mph, 10 mph below the posted speed limit. Vol. II 277:3–14. Hermance testified that when a snowmobile leaves the ground "you can't steer the snowmobile, you can't brake the snowmobile, you can't accelerate the snowmobile, your buttocks comes off the seat and you go from having one center of mass to having two centers of mass interacting with each other, those being the snowmobile and the body." Vol. II 276:15–20. Because the rider in the Forest Service video was aware that the hill was coming, he prepared for it and was able to maintain control of the machine. Vol. II 278:21–22.

77. Hermance provided credible testimony that the sole factor determining whether a snowmobile will leave the ground going over a hill is the speed of the snowmobile at the crest. Vol. II 297:23–302:8. Whether the rider is accelerating or braking is irrelevant—what counts is the speed of the machine at the time it crests the hill. As shown by the government's own video, if the speed is 45 mph or greater, the machine will lift 2–3 feet off of the ground. Vol. II 279:1–9.

78. The Forest Service riders were aware the hill was coming, and were therefore able to prepare for it. Even Hermance testified, "I wouldn't mind going over that at 50 miles an hour if I knew it was coming; it would probably be fun. But to get it in the middle of night, when you're not ready for it, is a big deal." Vol. II 328:5–11.

79. Earl Applekamp, a Forest Service employee and expert for the government, stated that after he was asked to testify in this case, he went to the scene and rode the trail on a snowmobile. Vol. V 230:23–231:1. After driving over the accident site between 35–45 mph during day and nighttime conditions, he concluded the hill could be safely negotiated. Vol. V 227:9–22, 228:21–229:2. I find Applekamp's testimony regarding the warranting process credible, but I find his testimony regarding negotiation of the hill to be biased, unpersuasive, and discounted by the government's own video showing the sleds leaving the ground slightly at 35 mph, and markedly at 45 mph, and the fact that he was aware of the hill and could prepare for it.

80. I find the government's videotape and Hermance's explanation of it highly persuasive of the danger of this hill at speeds of 45 mph and higher, especially when ridden at night by a person unaware of its approach. The Forest Service rider was aware of the approaching hill and nonetheless became airborne. I find it wholly credible that riders unfamiliar with the terrain would similarly become airborne, but would have a much more difficult time reacting because of the shock and surprise of the event. No one in the Musselman party had traveled this section of the trail prior to the accident; thus, no one had notice of the hill, and no one could prepare for it.

### G. Expectancy and Reaction

81. "Expectancy" takes into account driver expectations in signing. Vol. II 290:18–20. The Forest Service Manual, EM–7100–15, § 11.1.2, reflects this concept:

> Driver expectancy and behavior on Forest Development Roads is also influenced by what was experienced on the previous section of road. Studies have shown that what a driver has just encountered is what the driver expects on the next portion of the road. This includes the road surface, width, alignment, and overall maintenance condition of the road as well as the presence or absence of signs and other traffic control devices.

* * *

If the road has inconsistencies from what a prudent driver would normally expect, the use of Traffic Control Devices should be considered to reduce the "surprise element" created by the need for an unexpected change in the road. Ex. 509. Thus, riders' expectancies on a trail system are formed by their prior experiences on the system. Vol. II 314:19–315:2.

82. Robert S. Kennedy was plaintiffs' human factors specialist. Dr. Kennedy is a certified human factors professional who has authored or co-authored more than 400 scientific and technical publications addressing night vision, visual motion perception, response/reaction time, postural equilibrium and balance, and the effects of alcohol on human performance. Dr. Kennedy has received numerous commendations for his work in human factors, including awards and grants from the Aerospace Medical Association and the United States Navy. Dr. Kennedy's expertise in human factors includes many years of service to the U.S. Navy and NASA working with naval aviators and astronauts involving performance testing and human factors engineering. In specific reference to the effect of alcohol on human performance, he is a committee member of the International Counsel on Alcohol, Drugs and Traffic Safety; a member of the Behavioral Toxicology Society; and has taught and been frequently published on the subject. Vol. III 567:1–570:17; Ex. 129.

83. I found Dr. Kennedy's testimony regarding riders' expectations of an approaching slope and ability to react credible and persuasive. I specifically found his testimony that the surrounding terrain, which is level, would create an expectation that the upcoming hill is going to be a gentle slope rather than the steep slope and precipitous drop it actually is.

84. Kennedy conducted tests at the accident site to determine what the riders were able to observe from the trail. Vol. III 570:20–571:6. He testified that a pitch of up to 4 degrees would be gentle, and expected in the absence of a sign. Vol. III 581:10–11. The slope herein is 11.5 degrees, which Kennedy described as "substantial." Vol. III 581:11–12. According to Kennedy, a rider traveling 35 mph has a reaction time of 1.6 seconds, and therefore needs a distance of 82.2 feet to react. Vol. III 586:24–587:5. As he explained, "you could stand at the crest of the hill and look down the hill. But if people are operating moving vehicles, the decision to not go over that hill or in what way to go over that hill has to be made at some significant distance back from where that crest is." Vol. III 581:4–8. According to Kennedy, headlights will show the crest about 150 feet before the hill, with black beyond. Vol. III 581:22–582:3. But importantly, what a rider sees 150 feet before the crest is the same whether the grade of the hill is 4 degrees or 11.5 degrees. Vol. III 582:4–9.

85. Moreover, if the rider expects a typical slope of 4 or even 6 degrees, an 11.5 degree slope becomes very steep because it is so unexpected. Vol. III 582:17–583:10.

86. Hermance testified that the first sensation a rider would have as his snowmobile left the ground would be of "the bottom dropping out." Vol. II 280:13–14. This is confirmed by various witnesses who testified that this is what they felt going over this hill. *See supra.* Vertical velocity is 32 feet per second squared. Vol. II 280:22–23. Thus, it would take about a second for a snowmobile to drop the 17 feet grade of this hill. *Id.* As explained by Hermance, "with the time this person can even really understand what's going on,

they're going to slam down on the ground already." Vol. II 280:15–16.

87. Government expert Earl Applekamp drove about 80 miles of the trails in preparation for his testimony, and rode this hill at night as well as during the day at various speeds. He testified that as he approached the hill at night, he could see that the illuminated snow turned to black. He could also see the trees and brush beyond the hill; so, as a prudent driver, he slowed down to determine the grade of the hill. Vol. VI 58:16–59:10. The difficulty I have with his testimony as well as other government testimony regarding the safety of this hill is that it overlooks the fact that a rider who knows the hill is coming can prepare for it. Applekamp's testimony does not establish any objective facts about the expectations or reaction time of a nighttime rider unfamiliar with the terrain. It simply establishes that a rider who knows the hill is coming can safely negotiate it, which weighs more in favor of the plaintiffs' claim that a warning sign is needed.

### H. Need for a Sign

88. The riders in the Musselman party had been riding the West Yellowstone and Yellowstone National Park trails for two days prior to this accident. If those systems included other hills like this one, and those hill were not signed, their expectancy would be that there could be more hills like this one. Vol. II 315:3–6. However, there were no other hills like this on the groomed portion of the trails system that were not signed. Vol. II 414:5–415:7; Vol. III(ML) 785:25–787:8.

89. This trail system is "very well-signed." Vol. II 287:16.

90. Dr. Kennedy explained the basis for his opinion that the riders would expect a steep hill to be signed: "One had to do with the amount of regulatory materials and maps and signage that was there. The other had to do with the fact that [the trail] was freshly groomed. The other had to do with the fact that these [trails] are well-known and people had gone from a long distance to go on these trails. All of that was part of what I used to consider how expectancies would be formed." Vol. III 613:19–25. As explained by reconstruction expert Hermance, "You're on a trail system that's well-signed, it's maintained, it's groomed, and you're going down a nice, flat, straight section of it; you don't expect to run into any type of hazardous situation, whether it be a hill, sharp turn, railroad track, bridge, whatever, without having a warning sign for it." Vol. II 291:1–6.

91. Snowmobile signing standards are established by the agency in charge of signing. Vol. II 286:20–25. There is no uniform guideline. Vol. II 322:9–24. What is most important, according to Hermance, is consistency within the particular trail system. Vol. II 287:6–10. As he explained, "If a person rides and they see nice, groomed trails and they see signs for hazards, you have to make sure that all of the hazards are signed." Vol. II 287:8–10.

92. In Hermance's opinion, "if the snowmobile is going to go in the air at or near the speed limit, either the hill should be taken out or the best way to remedy it would be to put up a warning sign." Vol. II 277:23–278:1. The proof here is that a snowmobile going 10 mph less than the posted speed limit will unexpectedly leave the ground and become airborne.

93. I find through all of these witnesses that the smooth, groomed straight trail as well as the adjacent level terrain created a reasonable expectation on the part of riders unfamiliar with the trail that the hill, although discernible, would be a gentle slope of 4 degrees rather than a steep slope of 11.5 degrees. Moreover, I find that the presence of signs throughout the trail system created a reasonable ex-

pectation that a hill of unexpected steepness would be signed. In the absence of a warning sign, the hill was a hazard.

94. By maintaining the trail as a highly groomed straightaway, the Forest Service made a hazard when it created an expectation that either the grade would not change drastically or a sign would warn users of a sudden change in grade. In fact, the straightaway encouraged riders to ride fast. The fact that Leinberger, Kalahar, and Johnson were traveling 5–10 mph faster than the posted speed limit was completely foreseeable.

### I. Prior Accident

95. On the night of February 9, 1996, 16 days prior to Musselman's accident, two snowmobilers riding south toward West Yellowstone crested the same hill and were surprised by a snow grooming machine coming up the hill toward them. Ex. 23. The riders were Richard Panzer and Adam Lurie. The investigating officer reported that the snowmobilers were riding 35–40 mph, which he stated was too fast for the conditions. Vol. IV 120:9–122:19.

96. The accident report states:

a. "Panzer crested a small hill and Groomer No. 4 was just coming out of the bottom and starting up the same hill that Panzer had crested. Panzer and party did not see the lights on the groomer until they crested the hill."

b. The weather was "clear," but visibility was only "fair" because the accident occurred at night.

c. Estimated speed was "35 to 40 miles per hour."

d. Alcohol was not a contributing factor.

e. No citations or warnings were issued and that there was no violation or prosecution for the accident.

Ex. 23. The Panzer accident report was received for the limited purpose of prov-

ing the Forest Service was on notice of a hazard at the hill. Vol. IV 117:15–118:16. Specifically, this accident provided notice to the Forest Service that 1) the steepness of the slope makes it impossible for southbound riders to see beyond the crest of the hill, and 2) the posted speed limit was too high for foreseeable nighttime use.

97. The seat of Panzer's snowmobile was damaged, but no one was injured. Ex. 23.

98. Claude Coffin, assistant ranger of the Hebgen Lake District, testified that he and counsel for the United States attempted to recreate the Panzer accident a few years ago by arranging for a groomer to drive north on the Big Sky Trail at nighttime. Vol. III 652–654. The groomer is equipped with two headlights, similar to car headlights, and has a flashing light on top. Vol. III 656:8–23. Coffin observed the recreation, standing about 100 feet north of the crest of the hill. Vol. III 655:1–4. When the groomer was at the bottom of the hill, he could not see it. Vol. III 656:4–7, 665:13–23. He could see illumination from the groomer's lights "at times." Vol. III 665:24–25.

99. The agency's reenactment of the Panzer accident serves as independent confirmation that the sight distances at this site were impaired by the steepness of the hill. The accident provided actual notice to the Forest Service that the hill posed a serious visibility hazard.

100. The government contends that the Panzer accident proves that a snowmobile cresting the hill at 40 mph has sufficient time to avoid a serious collision with an object in the trail. The fact is, however, that Panzer was unable to avoid colliding with the groomer. A groomer is a huge machine, about 10–12 feet tall. Vol. III 656:8–23. Had Panzer collided with a person in the trail rather than a machine, it is

reasonable to conclude the collision would have been far more serious, and caused injury—perhaps serious—to the person.

## J. Forest Service Duties

■ 101. The portion of the trail where the accident took place is a designated Forest Service snowmobile trail. Vol. I 194: 20–22. The Forest Service had sole responsibility for identifying and correcting hazards. Vol. I 200:5–14; Vol. VI 4:19–6:17.

102. Once the Forest Service identifies a hazard on the trail system, it must eliminate it. Vol. I 199:15–200:4. It may change the trail grade, alignment, or location, separate traffic, or take other measures to eliminate the hazard. Vol. III(ML) 707:10–14. It may also choose to eliminate the hazard by placing an appropriate warning sign on the trail. Vol. I 199:21–25; Vol. III(ML) 707:8–15.

103. Plaintiffs introduced numerous sections from the Forest Service Manuals and the Manual on Uniform Traffic Control Devices to establish the Forest Service's duty to take particular actions in regards to this hill. However, the testimony of Donna Sheehy, Civil Engineer in the Transportation Operation and Maintenance section of Engineering for the Northern Region of the Forest Service, persuades me that the duties established by these manuals are broad, and do not mandate that any particular action be taken at this hill in the absence of a hazard having been identified by the Forest Service.

104. Mrs. Sheehy's credentials are extensive. Ex. 27, 2:18–3:19; Vol. III 679:16–681:20, 712:6–713:4. She was responsible for the last two rewrites of EM–7100–15 (Standards for Forest Service Signs and Posters) and is involved in the most recent revision. Vol. III 704:25–705:16. She testified that if Forest Service personnel determine something is a hazard, they must eliminate it by changing the trail grade, alignment or location, or installing a warning sign. Vol. III 706:25–707:15. She also testified that EM–7100–15 and the Manual on Uniform Traffic Control Devices (MUTCD) are mandatory only insofar as they dictate the type of sign that must be used once a decision has been made to place a sign. Vol. III 705:24–706:12.

105. The Forest Service is given broad discretion in identifying hazards. One method of identifying hazards on a trail system is to "warrant" the trail by riding it. The Forest Service is not required to warrant a trail. Vol. III 710:21–25. The warranting process is highly recommended, but not mandatory. Vol. III 710:21–25. Moreover, nighttime warranting is not required by any manual. Vol. III 711:23–712:5.

106. I find through this testimony that the Forest Service did not have an explicit mandatory duty to take action with respect to this hill. Had it identified this hill as a hazard through the warranting process, it would have been required to take some sort of corrective action. But in the absence of such identification, the manuals imposed no duty on the agency.

107. However, the lack of an explicit mandatory duty is separate from the duty to use reasonable care imposed upon the Forest Service by Montana law, M.C.A. § 27–1–701, and is recognized by the Montana snowmobile statute. M.C.A. § 23–2–653(2). This duty is absent only if the hill herein is an "inherent risk" of snowmobiling. *See* discussion *infra.*

## K. Trail Warranting Process

108. The Forest Service process of identifying hazards on trails is referred to as "warranting." Jonathan Kempff, the program manager for the Gallatin National Forest trail program, described it as "the process of identifying the hazards that our average, prudent, reasonable rider would

not expect based on a spectrum of users that we had out there." Vol. I 212:7–9. The warranting process is designed to take into account the "broad spectrum of users, all the way from beginning riders all the way to high-end riders that tend to go faster." Vol. I 206:22–9.

109. To warrant a snowmobile trail, Forest Service employees ride the trail at 35 mph during the day and note hazards. Once a hazard is identified, the Forest Service can close the trail, correct the hazard, or warn the user. Vol. I 199:15–23.

110. The trail herein was warranted in 1993 by Forest Service employees Ron Naber and Mary Vandiver. Vol. II 422:12–18. Naber and Vandiver rode the trail north and south, during the day, at 35 mph. Vol. II 422:3, 423:10–14. They did not identify this hill as a hazard during the 1993 warranting process.

111. The Forest Service does not warrant trails at night, although it is aware that riders use these trails at night. Vol. II 422:4–7. It accounts for nighttime riders by using reflectorized signs, and by assuming that drivers will adjust their speeds to account for reduced visibility. Vol. I 223:21–224:4; Vol. II 424:15–25; Vol. III 698:2–5.

112. Sight distance is different at night than during the day because riders are dependent on their headlights at night. Vol. I 221:25–222:14. Several witnesses testified that certain human factors make nighttime operation different from daytime operation, such as the difference between artificial lighting from headlight beams and natural lighting, the lack of peripheral vision due to the focus of headlight beams, and the movement or bouncing of headlights. Vol. III 697:11–698:11. Forestry technician Ron Naber agreed that something may not be a hazard during the day but could become a hazard at night. Vol. II 348:11–13.

113. Sight distance is one factor the agency must consider when warranting a trail. Vol. I 221:18–21. It is relevant to reaction time, as a person needs to be able to see a hazard in order to react to it. Vol. I 221:22–24. Jonathan Kempff testified that sight distance is "definitely" different at night than it is during the day. Vol. I 221:25–222:2.

114. The trail herein was warranted a second time in November 1996, nine months after the accident. By then, the Forest Service had realigned the trail approaching the hill from the north. Rather than a straight, flat approach, it curved through the trees.

115. The 1996 warranting process resulted in placement of one sign for riders from the north indicating that the trail curves to the left and a second sign indicating that a downhill is approaching. The warrant form, completed by Ron Naber, states that "at night this hill can sneak up on a person," and indicates the Forest Service expects to "reduce the crown of the hill" in the coming year. Ex. 20. Moreover, it impeaches various witnesses' contention that no sign was needed at this site.

### L. 45 MPH Speed Limit

116. One month prior to this accident, in January 1996, the Forest Service implemented a speed limit of 45 mph on the trails in and around West Yellowstone. Ex. 18; Vol II:419:8–10. It was the first time a speed limit had been established for snowmobile trails in the area. Vol. II 420:7–13. The speed limit was determined solely on the basis of consistency with the speed limit in adjacent Yellowstone National Park. Vol. II 419:22–25. The Forest Service did not warrant the trails at 45 mph prior to establishing the speed limit. Vol. II 422:1–3.

117. Donna Sheehy testified that signs are aimed at the "prudent driver," i.e., the

85th percentile at which most riders would ride a trail. Vol. III(ML) 713:5–714:17. Sheehy further testified that the 85th percentile would be the posted speed limit, which in this case was 45 mph. Vol. III(ML) 718:10–719:25. But no warranting process was ever conducted at 45 mph; it was conducted only at 35 mph. The posted speed limit therefore misleads snowmobile operators approaching this dangerous hill, especially at night.

118. Although the Forest Service has broad discretion in managing the snowmobile trail system, and in warranting the trails for hazards, it must also exercise reasonable care in its actions. The fact that the agency warranted these trails at 35 mph during the day, although fully aware that snowmobilers ride the trails at night, is reasonable because the agency expects riders to adjust their speeds to the conditions. The fact that the agency opted not to warrant the trails at night is a discretionary decision with which I believe the Court cannot interfere.

119. But the decision to post a speed limit of 45 mph without conducting any warranting process at that speed strikes me far differently. The agency knew that snowmobilers travel the trails at night, that snowmobilers already travel in excess of 50 and even 60 mph, especially on straight, newly groomed trails, and that snowmobilers expect to be warned of unexpected hazards given that this trail system is well-signed. Nonetheless, they imposed a speed limit of 45 mph on the trails for the sole reason that that is the speed limit in adjacent Yellowstone National Park, and failed to consider that riders would assume that riding at that speed limit is safe. As noted, the posted speed limit misleads snowmobile operators and creates false expectations of safety, particularly at this hill and particularly for a rider who is unfamiliar with this trail.

120. The evidence before me establishes conclusively that this hill is not safe when ridden at 45 mph for riders who are unfamiliar with the imminent hazard created by the combination of trail slope, posted speed, and reasonable rider expectancies.

### M. Necessity For Warning

121. Shortly after the accident herein, Forest Service recreation technician Ron Naber placed a yellow caution sign warning of "dips ahead" at the approach to the hill. Ex. 530; Vol. II 362:8–364:10. Eventually, the Forest Service reconfigured the approach to the hill, changing it from a flat straightaway to a curving trail through the trees. Vol. II 364:2–7. It then placed two signs at the approach to the hill—one warning of the curve ahead, and a second warning of the downhill. This proof impeaches the assertion that a warning sign is not required at the site.

122. Richard Hermance, Plaintiffs' snowmobile safety and accident reconstruction expert, testified that this hill was a hazard because a snowmobile would leave the ground at 35 mph. He testified that a rider on this trail in this trail system would expect to be warned of a hill so steep that one becomes airborne below the speed limit. Finally, he testified that any sign cautioning riders of the hill ahead would have been adequate. Vol. II 339:9–340:23.

123. Although the trail was reconfigured in the months following this accident, Vol. II 354:17–355:19, the grade of the hill is unchanged. Vol. III 642:24–644:14. The Forest Service's position through trial testimony is that the hill is not a hazard, and that the only reason it is currently signed is because riders coming out of the trees may be surprised by the hill. Vol. II 431:9–12. However, other testimony established that the agency does not warn *except for* hazards. Under the 1996 warranting, the hill is signed separately from

the curve, impeaching the Forest Service witnesses' testimony about whether this hill is a hazard.

124. I find that the hill was a hazard that the agency failed to identify. The Panzer accident provided the agency with actual notice of the hazard. Its failure to eliminate a hazard of which it knew or should have known breached that duty, and caused Brian Musselman's damages.

### N. Forest Service Negligence

■ 125. The Forest Service had a duty as a landowner to use reasonable care in maintaining the snowmobile trails herein and warning users of hazards. M.C.A. § 27–1–701.

■ 126. The Forest Service has a duty to eliminate hazards that it has identified. It had not identified the hill herein as a hazard during the warranting process. However, it arbitrarily imposed a 45 mph speed limit on the trails, failing to consider whether this hill would be hazardous at that speed, and ignored evidence of the visibility hazard provided to it by the Panzer accident.

127. The Panzer accident gave the Forest Service actual notice that visibility for southbound riders was substantially impaired by the hill in question for nighttime riders. According to the report filed by the investigating officer, Panzer was driving at 35–40 mph—well under the posted speed limit, and within the range of "prudent" speeds discussed by trial witnesses. Nonetheless, Panzer was unable to see the groomer until he crested the hill, at which point it was too late for him to avoid hitting the groomer.

128. Additionally, the Forest Service implemented a speed limit on the trail system without warranting the trails at that speed. Although it had no duty to use the warranting process in the first place, once it made the decision to warrant, it had a duty to use that process reasonably. Uncontroverted testimony established that the sole rationale for implementing a 45 speed limit was because that was the speed limit in adjacent Yellowstone National Park. The agency's failure to warrant the trails at the designated speed limit breached its duty to use reasonable care.

129. The Forest Service witnesses testified that they initiated the warranting process in 1990 because of concerns about increased number of snowmobilers and increasing power and speed of snow machines. Vol. I 231:5–23. They knew that snowmobilers were riding these trails at speeds of 60 mph. They knew that a straight, flat, newly groomed trail encourages speeding.

130. Moreover, the Forest Service considers 35 mph to be the reasonable prudent speed at which the trails should be ridden during the day, but does not provide that information anywhere to users. Vol. I 352:10–25. The only information provided to users, in the absence of warning signs, is that the speed limit is 45 mph. In addition, the Forest Service believes the reasonable prudent speed at nighttime to be less than 35 mph, but does not anywhere indicate that to users of the trails.

131. The relevant information provided to the Musselman party that night through signs was that the speed limit was 45 mph. The relevant information provided through the riders' surroundings, creating the riders' expectations, was that the trail was flat, smooth, and well-groomed, and that any unexpected steep grades would be signed.

132. I find through all of these witnesses that the Forest Service's only method of accounting for potential hazards unique to nighttime riding was to assume that riders would reduce their speeds. It did not advise riders to reduce their speeds at night. It did not warrant trail

hazards at night. It warranted this trail at 35 mph, during the day. It posted a speed limit of 45 mph—a speed at which a snowmobile becomes airborne going over this hill—and never warranted the trail at that speed limit. It created an expectation on the part of snowmobilers that this hill can be safely negotiated at 45 mph. For riders with actual knowledge of the hill, it can. But for those who have no idea what's coming, this hill is a hazard at 45 mph.

### O. Brian Musselman's Damages

133. As a result of the snowmobile accident at issue in this case, Brian Musselman suffered a traumatic brain injury, resulting in cerebral spastic quadriparesis and dysphagia (an inability to swallow and speak). He will be fully dependent on others for all of his activities of daily living for the rest of his life. Vol. II 372:11–373:4, 374:7–375:14. Musselman is unable to communicate verbally, although he indicates "yes" answers by raising his leg. Vol. IV 130:2–11, 135:17–19. He cannot understand complex communication, but can respond to yes or no questions. Vol. V 26:5–20.

134. Musselman resides in an adult care facility, Deer Run Rehabilitation, Inc., which is licensed for patients with spinal-cord and brain injuries. This facility was built by Musselman's parents for his care as well as the care of other patients. Vol. V 16:11–21.

135. Musselman is spastic and quadriparetic, and requires 24-hour care to attend to his basic needs such as feeding, bathing, grooming, and dressing. Vol. V 27:1–9. He is incapable of managing his own bowel and bladder functions. Vol. V 30:2–4. Although there was testimony that his ability to communicate his needs to others may improve, his overall condition is not expected to improve. Vol. V 28:7–20, 32:15–21.

136. Owen Perlman, M.D., testified that although Musselman is able to take in information equivalent to a ten-year-old, he is able to recall past experiences, which is why he smiles at boats and snowmobiles. Vol. II 408:6–409:6. Dr. Perlman also testified that Musselman appeared to grieve over the loss of his ability to raise his daughter and have companionship. Vol. II 400:18–401:10.

137. The parties stipulated to past medical expenses at $1,008,428.76. Final Pretrial Order 10, Agreed Facts ¶ 7.

#### 1. Lost Earnings

138. Brian Musselman was vice president and general manager of International Engineering and Manufacturing, Inc. (IEM), a family-owned business that manufactures snowmobile traction devices. Vol. IV 214:10–21, 215:23–25. Musselman owned 38 percent of IEM stock at the time of his accident. Vol. VI 233:21–24.

139. For three years prior to the accident, Musselman's average earnings were $306,000. Vol. VI 237:6–9. Musselman's compensation was a base salary plus a share of the profits. Profit-sharing was based on Musselman's performance, not the profits of the company. Vol. V 14:8–18, 18:1–19:12.

140. The government's economic expert, David Johnson, separated Musselman's earnings into base salary plus "business profits." Vol. VI 226–267. Rather than relying on Musselman's actual income, Johnson relied on a cohort of similarly aged men with a similar level of education. Vol. VI 261:12–262:1. Statistics are used in place of actual knowledge, as a way to extrapolate from what we know to what we would like to know. In the case of Brian Musselman's earning capacity, there is no need for statistical projections, because we have uncontroverted evidence of his actual earnings in the form of his W–2s.

■ 141. Johnson testified that closely held businesses often use a combination of wages and bonuses to compensate employees. Vol. VI 268:5–12. The record reflects a proven track record of consistently high earnings being paid from IEM to Brian Musselman. Musselman was slated to succeed his father as chairman and CEO of IEM at some point in the future. Vol IV.216:1–5. The business was and is profitable. Vol. IV 201:12–17. I therefore find that the proper base earnings from which to calculate Musselman's future lost earnings capacity are his wages plus bonuses as reflected on his W–2s for the years 1993, 1994, and 1995.

■ 142. Plaintiffs' economic expert Joseph Kasperick testified that Musselman's past earnings increased from $274,561 in 1993 to $352,986 in 1995. He calculated the present value of those earnings to be $336,000 to $410,000. Using $280,000 as Musselman's base earning capacity for the remainder of 1996, and increasing that by 3% per year to the date of trial, Professor Kasperick calculated the present value of Musselman's base earning capacity for 2001–2002 at $324,600. Kasperick then calculated Musselman's lost earnings from the date of the accident to the time of trial at $1,772,604. Vol. IV 184:2–23, 185:21–25, 196:22–197:11; Ex. 522, 10, 18.

143. Relying on Professor Kasperick's testimony, I find that Brian Musselman had a work life expectancy of 25.45 years at the time of his accident. Vol. IV 183:14–10; Ex. 522, 7. Using $324,600 as Musselman's base earning capacity in 2001, and Professor Kasperick's net discount rate of 2% for 25.45 years, I find Brian Musselman's future lost earning capacity to be $5,340,812.

144. Thus, I find the present value of Musselman's lost earnings and future lost earning capacity to be $7,113,416. Vol. IV 197:12–20; Ex. 522, 19.

## 2. Life Expectancy

145. Brian Musselman's life expectancy is crucial to determining the proper amount of future medical expenses. Plaintiffs' life care plan assumed a normal life expectancy of 37 years. Ex. 521. However, defense expert Robert Shavelle, PhD., MBA, provided credible expert testimony that Musselman's life expectancy is much shorter than that—12.8 years. Vol. V 187:4–23.

146. Dr. Shavelle testified that in calculating life expectancy, he takes into account age, sex, medical conditions, injuries, and functional abilities. Vol. V 181:17–23. He stated that important factors to consider for an adult with a traumatic brain injury are mobility, the need for tube feeding, and to a lesser extent, cognitive ability and minor medical conditions. Vol. V 182:18–24. Dr. Shavelle testified that the more risk factors he can take into account, the more accurate the computation. Vol. V 181:23–24.

147. To determine Brian Musselman's risk factors, Dr. Shavelle reviewed Musselman's medical records, Dr. Jonathan Stone's evaluation of Musselman's condition, and the deposition of treating physician Dr. Bergeon. Vol. V 184:16–185:1. Dr. Shavelle explained that Musselman's risk factors include his traumatic brain injury, the amount of time since his injury, his age and sex, his inability to walk, crawl, or lift his head, his need for tube feeding, and the fact that he has some communication ability. Vol. V 211:12–18.

148. Dr. Shavelle then applied these risk factors to his database to find a group of people with risk factors similar to Brian Musselman's, so that he could determine the average actual survival time of people very similar to Brian Musselman. By using this methodology, Dr. Shavelle determined that Musselman's life expectancy, or the average amount of time someone with

all of these risk factors will live, was 12.8 years from the date of trial. Vol. V 187:4–23.

149. Shavelle's opinion is supported by literature in the field of life expectancy. According to the scientific literature, a tube-fed immobile patient has a life expectancy of 11.6 years, a tube-fed quadriplegic has a life expectancy of 12.4 years, and an adult with cerebral palsy has a life expectancy of about 12 years. Vol. V 189:4–19.

150. Moreover, the literature suggests that individuals with traumatic brain injuries have reduced life expectancies, even without the other risk factors specific to Brian. One article predicted a life expectancy of 11.3 years for a 40–year–old who suffered a brain injury. Another article concluded that an 18–year life expectancy was likely. Vol. V 189:20–190:14. I believe these articles alone discount the notion that Brian Musselman could have a 37–year life span.

151. Plaintiffs' treating physician Dr. Bergeon testified that based upon the fact that Brian's condition appears to be stable and the fact that he has not experienced significant complications, he "has as good of a chance as a person without severe disabilities of living a normal life span." Vol. V 44:6–13. Dr. Bergeon testified that his opinion about Brian's life expectancy is based on his clinical experience with patients in Brian's condition. Vol. V 48:2–5. He stated that he has seen over 8,000 patients and is aware of their survival rates. He asserted that some of them died at what he considered a normal life expectancy for them. Vol. V 49:13–50:2. However, I find Dr. Shavelle's methodology, and his opinions based on that methodology, more credible than Dr. Bergeon's. Calculations of future medical expenses will be done based upon a life expectancy of 12.8 years from the date of trial. I have used this figure not only in calculation future medical costs but also in arriving at

reasonable compensation for pain and suffering as well as loss of an established course of life.

### 3. Future Medical Expenses

152. Both parties presented experts who prepared life care plans to calculate the costs of Brian's future medical and related care needs. Ex. 521(Noe), Ex. 1020 (Goodrich). Having listened to the testimony of plaintiffs' expert Alice Noe and defendant's expert William Goodrich and reviewed the life care plans, I find Mr. Goodrich's plan more credible.

153. For example, Goodrich testified that basic costs for food, shelter, and transportation cannot be included in future medical expenses, as they are normally incurred and paid for out of a person's earnings, and are therefore compensated for in lost future earnings. Vol. VI 193:21–194:21, 208:2–11. To the extent Musselman's basic needs cost more because of his disability, Goodrich's plan allows for the difference.

154. Goodrich also offset projected costs by expenses that a nondisabled person would incur such as routine medical and dental care. Vol. IV 79:1–17; 82:12–16. For example, Musselman's doctors recommend four dental visits a year. Goodrich therefore allowed for four visits, but deducted the cost of two because they are "usual and customary." Vol. VI 196:13–197:1; Ex. 1020, 61. In contrast, Noe's plan simply allows for four dental visits per year. Ex. 521, 10.

155. Additionally, Noe's plan makes several assumptions unsupported by the evidence. For instance, Noe testified that Musselman "has a seizure disorder that may need to be monitored with EEGs." Vol. IV 39:11–12. She projected the lifetime cost of these tests at $1,104–1,472. Vol. IV 57:5–12. However, when questioned about her statement that Brian has a seizure disorder, Noe's testimony was

vague. She could remember seeing medical reports that "talk of seizures," and one EEG that had "questionable activity on it." Vol. IV 90:8–91:1. Her plan fails to state who recommended these tests. Ex. 521, 14.

156. Noe's plan also allocates costs for items that Deer Run supplies for Musselman. Noe testified that she included those costs without knowing whether they are covered by the facility. For example, Noe's plan provides for Musselman's intravenous food, Jevity fluid, at a cost of $4,555.20 per year. Ex. 521, 21; Vol. IV 84:7–25. Conversely, Goodrich's plan provides for Jevity at a yearly cost of $559.60, based upon a survey of facilities in the area indicating that the cost of nutrition is included in the daily facility cost. Ex. 1020, 41. Moreover, Goodrich offset the cost of Brian's food by the average annual expenditure for food in a single person household, thereby coming up with a lower, more accurate number. Ex. 1020, 41.

### a. Case Management

157. Noe's plan provides $20,020 $40,040 a year for case management. Ex. 521, 9. Conversely, Goodrich's plan allots one hour per month for case management at an annual cost of $3,854.16, including an allocation for travel time. Ex. 1020, 16. Noe explained that a case manager implements the life care plan by setting up appointments and attending them with the client. In her initial report, she allotted one hour per month for case management, but increased that figure to 5–10 hours per week in her second report. She stated that the need for case management changed based on how often Brian was actually going to appointments. Vol. IV 72:2–19.

158. While Noe acknowledged that many people, including Oberson, Deer Run employees, and an insurance case manager already perform these tasks, Vol. IV 75:16–77:25, she recommends that all case management activities "be transferred to a case manager, either an outside agency or the guardian." Ex. 521, 4. I find Goodrich's allocation to be reasonable and sufficient.

### b. Therapies

159. Both life care plans project cost for various therapies as recommended by Dr. Perlman.

### i. Speech Therapy

160. Perlman testified that speech therapy would be focused on improving Brian's ability to swallow. He stated that this will probably not improve, and Brian is not likely to ever be able to speak successfully; thus, he "may not require much speech therapy." Vol II 399:21–400:1. Goodrich's plan follow this recommendation by providing for speech and cognitive therapy once every 2–6 weeks at a cost of $1,000–3,250 per year. Ex. 1020, 18. Goodrich testified that this therapy will be related to Brian's use of the dynabox, his augmentative communication device. He stated that once the therapists complete the communication and cognitive training, they will likely only be involved periodically to evaluate programing needs and technologies. Vol. VI 185:13–186:3.

### ii. Physical and Occupational Therapy

161. Noe's plan provides for physical therapy (PT) 5 times per week at a yearly cost of $45,500, and occupational therapy (OT) 3 times per week at a yearly cost of $21,840. Ex. 521, 9. Perlman testified that Brian requires PT and OT only 2–3 times per week, and that to justify more Brian needs to demonstrate functional improvement. Vol II 406:6–407:19. Dr. Bergeon, Brian's treating physician at the time of trial, testified that from a functional physical standpoint, Brian has reached a plateau, and is unlikely to make major improvements in spasticity or tone. Vol V 34:2–16, 35:24–25. Consequently, Dr. Ber-

geon testified that someone in Brian's condition does not indicate the need for a lifetime of formal therapy. Vol V 45:8–13.

162. Goodrich's plan follows the recommendations of both Bergeon and Perlman. He provides for OT 2–3 times per week at a yearly cost of $6,720–10,080, and PT 2–3 times per week at a yearly cost of $14,400–27,360. Ex. 1020, 17.

163. Dr. Bergeon also testified that his hope is that an aide could be trained to perform Brian's range of motion exercises in order to maintain Brian's current level of motion. Vol V 45:8–21. Goodrich noted that his allocations for all therapies—physical, occupational, and speech and cognitive—could be reduced by certifying aides to perform the therapies under the supervision of therapists. He testified that therapists charge $140–$170 per hour, while aides charge $10–$15 per hour. Vol. VI 202:20–203:8. Goodrich stated that a qualified aide would provide the best care because he or she could provide therapy seven days a week. Vol. VI 215:13–19. This follows Perlman's recommendation that Brian needs some type of therapy almost every day, some of which could be performed by trained aides. Vol. II 407:10–19. Goodrich testified that if qualified aides provide the type of care Brian needs, cutting his plan's allocations for therapies in half would liberally provide for the cost of aides. Vol. VI 217:24–218:24.

164. I believe that cutting the funding provided for in this plan would be speculative, as it was not established that trained aides are available for all of the various therapies required by Brian Musselman. I find that Goodrich's life care plan allocation for all types of therapy is adequate and should not be cut.

### iii. Individual Counseling

165. Goodrich's plan also provides for counseling at a yearly cost of $170–290. Ex. 1020, 16. Goodrich testified that this is necessary because Brian has cognitive functioning, and life changes, such as those involving Devon's maturation process, may warrant counseling to help Brian adjust. Vol. VI 182:14–24. This opinion is supported by Dr. Perlman's testimony that Brian appears to experience problems with grief over his institutional setting and his inability to raise Devon. Vol II 401:4–10. Perlman also testified that he believed Brian is capable of expressing and feeling emotions. Vol II 396:11–25. Thus, I find that the evidence supports funding for individual counseling.

### iv. Wheelchair

166. Both life care plans provide for the wheelchair and maintenance at approximately the same cost. Ex. 521, 15–16; Ex. 1020, 22. However, Goodrich noted that Brian got a wheelchair in 2000, and would not need a replacement until 2005. He also took into account the fact that the first year's maintenance would be covered under warranty. Vol. VI 186:11–187:3. Goodrich's plan also provides for accessories such as a seatbelt, arm supports, cushion arm straps, a head strap, foot switch for toggling yes or no, and a wheelchair pouch. Ex. 1020, 24–27; Vol. VI 188:9–189:2. I find Goodrich's explanation for these accessories reasonable, and find Goodrich's wheelchair allocation to be sufficient.

### v. Orthotics/Prosthetics

167. Both plans provide for these devices. Ex. 521, 17; Ex. 1020, 29–30. The difference in the allocations comes in the frequency of replacement. Goodrich testified that his plan provides for less frequent replacement because Brian is unable to ambulate, so the wear on the device is less than if Brian were using the orthotics to stand. Vol. VI 190:4–12. I find this to be a reasonable assumption, supported by the evidence.

### vi. Equipment

168. Goodrich noted that his plan did not provide for a hospital bed because he believed Deer Run provided hospital beds. Vol. VI 190:2022. Noe's plan provides for a hospital bed at a cost of $1,500 every 7–10 years, or $187.50–$214.29 per year. Ex. 521, 18. The testimony clearly establishes that Brian Musselman needs a hospital bed. I therefore find this to be a necessary cost of $1,500 every 8.5 years; thus, the cost for 12.8 years is $2,258.82. Discounting that by 4.69%, *see infra* ¶ 186, I find the present value of this medical supply to be $2,151.88.

169. Noe's plan allocates $25.00–41.67 per year for a suction machine. Ex. 521, 18. However, she acknowledged that Deer Run already has a suction machine, and she testified that she did not know whether patients other than Brian use the machine. Vol. IV 92:17–93:17.

170. Beyond the hospital bed and the suction machine, both plans provide for approximately the same equipment. However, the plans differ in terms of replacement costs and frequency. I find Goodrich's approach reasonable.

### vii. Medication

171. The medication provided for in both plans is essentially equal. Ex. 521, 19–20; Ex. 1020, 48–52. However, Goodrich noted that his plan must be adjusted to back out the medication costs for Claritin and Flonase because Brian's case manager said that these medications are not related to Brian's injury. Vol. VI 192:21–193:20. His plan estimates the yearly cost of Flonase at $307.18, and Claritin at $482.56. Ex. 1020, 47, 49. Economics expert David Johnson testified that the present value of Goodrich's plan should be lowered by $8,060 to back out the costs of Flonase and Claritin. Vol. VI 256:15–25. I find this deduction in accordance with the evidence.

### viii. Place of Care

172. Goodrich's plan does not provide for costs related to a home care option as does Noe's. Goodrich testified that because Brian's family built Deer Run expressly for him, it acts as his home and facility. Because Deer Run provides excellent care for Brian's needs, Goodrich saw no need for another option. Vol. VI 193:21–194:8.

173. Deer Run was built for Brian Musselman. It is a full facility and cares for other patients, but the core reason it exists is to provide for Musselman's special needs. Plaintiffs' expert Noe testified that she had no reason to believe Deer Run would not continue to provide what she labeled as a "very high" level of care. Vol. IV 51:10–13, 95:13–18. I find a preponderance of the evidence establishes that Brian Musselman will live at Deer Run rather than at home or at another facility, and therefore do not address Noe's alternative living arrangements in her plan.

### ix. Interventions

174. In terms of medical and surgical interventions, Goodrich's plan builds in twice the hospitalization costs that Noe's plan provides. Ex. 521, 12; Ex. 1020, 73. Goodrich testified that this is necessary because Brian poses a greater risk for complications due to his fragile condition. Vol. VI 199:11–200:13. I find this reasonable and supported by the evidence.

### x. Recreation

175. Noe's plan provides $96,000 for a specialized motor home. Ex. 521, 25. She conceded that this is not necessary to keep Brian alive, but testified that the ability to travel is important to his quality of life. Vol. IV 65:4–10. In contrast, Goodrich testified that Brian's condition necessitates that he be near emergent medical care at all times because of his high risk of complications. Vol. VI 198:16–199:10. Goodrich's plan does not provide

anything for leisure and recreation because he did not believe that Brian is capable of recreation beyond what is usual and customary for nondisabled individuals, such as renting movies. Vol. VI 198:9–15. Under the proof here I find that the cost of a motor home is not a reasonable future medical expense.

### xi. Conservatorship

176. Noe's plan projects a yearly cost of $6,500 for conservatorship. Ex. 521, 8. However, Goodrich did not allot for conservatorship in his plan because Oberson indicated that the trust provided for conservatorship. Vol. VI 201:14–21. I find Goodrich's assumption reasonable.

### xii. Gravity Feeding System

177. Goodrich's plan allots $2.70 for each daily bag and tube, and $619 for the replacement button tube (2/year). Ex. 1020, 40. Goodrich provides $60–$136 per year for a gastroenterologist to monitor the button tube (1–2/year). Ex. 1020, 60. He provides $300–$600 per year for a gastroenterologist to perform an endoscopic evaluation of the button tube to determine if replacement or repositioning is needed (1–2/year), and $700–$1400 to cover the hospital costs of endoscopy and to replace or reposition the tube (1–2/year). Ex. 1020, 70. He provides $157.50–$323.40 per year for replacement or repositioning of the button tube (1–2/year), and the same amount in hospital costs. Ex. 1020, 72. I find these reasonable costs and assumptions.

### xiii. Baclofen/Intrathecal Pump

178. Goodrich provides for a pump at $8,185–$8,985 and estimates it will need to be replaced every 3.5 years for a total of $2,338.57–$2,567.14 per year. He estimates a catheter at $495, and replacement every five years for a total of $99/year. He provides for a catheter access port kit at $25 each, replaced four times a year for a total of $100 a year. Ex. 1020, 34.

179. Goodrich provides for pump refill kits (medication) at $285 each, replaced four times a year for a total of $1,140 per year. Ex. 1020, 48. He provides for a neurosurgeon (future medical) for I/B pump analysis at $100–$200 per visit, four times a year, for a total of $400–$800 per year. He also provides for a neurosurgeon to program and refill the I/B pump at a cost of $60, four times a year for a total of $240 per year. Ex. 1020, 59.

180. He provides for a neurosurgeon to implant or replace the intrathecal pump or reservoir at a cost of $1,600 every 3.5 years for an annual cost of $640. This cost includes the surgeon, an assistant, and an anesthesiologist. Ex. 1020, 73. He provides for a neurosurgeon to implant or replace the intrathecal catheter at a cost of $1,500 every five years for an annual cost of $420 per year. He estimates that hospitalization costs associated with these surgeries at $17,802 a day for 1–4 days every 3.5 to 5 years, for a total cost of $3,560.40–$5,086.29 per year. Ex. 1020, 73. I find these projections reasonable, and more credible than Ms. Noe's comparable ones.

### xiv. Miscellaneous

181. Both plans provide for a one-time cost of $1,320–$1,650 for neuropsychological testing. Ex. 521, 14; Ex. 1020, 20. However, Goodrich noted that this testing was completed by the time of trial, so these costs should be backed out. Vol. VI 203:9–16.

182. Both plans also provide for a one-time cost of $140 for ophthalmology/neuro-ophthalmology. Ex. 521, 11; Ex. 1020, 62. Goodrich noted that this was needed only once to monitor the treatment of Brian's visual dysfunction. Because it has been completed, the cost should be backed out. Vol. VI 197:10–14.

183. Neither plan provides for transportation because, as Goodrich testified, Deer Run uses a converted van to trans-

port Brian, and that van is also used for all other patients at Deer Run. Vol. VI 197:15–24.

### c. Present Value

■ 184. As explained by government expert David Johnson, the net discount rate for computing the present value of the life care plan is based upon the historical relationship between medical inflation and consumer price index (CPI) inflation for the years 1994–2000. Prescription drugs were 142% of CPI inflation, medical supplies 54% of CPI inflation, professional medical service 142% of CPI inflation, and hospital services 182% of CPI inflation. Ex. 1030, 2–3; Vol. VI 252:10–253:10. This resulted in an average of all medical expenses at 130% CPI inflation. Ex. 1030, 3.

185. The current inflation rate of 2.4% was multiplied by each of the medical service categories, generating a medical inflation rate for each category. These inflation rates were then subtracted from 6% to determine the net discount rate for each component of the life care plan. Ex. 1030, 3.

186. I find that the appropriate net discount rates to be used in calculating the present value of the life care plan are as follows: prescription drugs—2.59%; medical supplies—4.69%; professional medical services—1.63%; hospital services—1.63%; with the average of all medicals at a net discount rate of 2.87%. Ex. 1030, 3.

187. Applying these discount rates, Johnson determined that the present value of Goodrich's life care plan ranges from $1,336,325 to $1,468,682. Ex. 1030, 5. The difference of $132,357 arises from the range of values Goodrich placed on many of the "therapeutic modalities." Ex. 1030, 5. Because neither the trial testimony nor the expert reports provide a sufficient basis for me to choose one number over the other, I believe the reasonable present value of the life care plan is $1,402,503. In addition, I am backing out $8,060 for the Flonase and Claritin, $1,500 for the neuropsychological testing, and $140 for the neuro-ophthalmology consult. I am adding $2,152 for a hospital bed. I therefore find the present value of the life care plan for Brian Musselman to be $1,394,955.

### 4. Pain and Suffering

■ 188. Although Brian is severely brain damaged, a preponderance of the evidence establishes that he has cognitive functioning. Dr. Perlman testified that, in his opinion, Brian appeared to feel grief over living in an institution and being unable to raise Devon. Vol. II 401:4–10. While the law sets no standard by which to calculate compensation for mental and physical pain and suffering, one need only review the transcript of family in this case, and observe the "Day in the Life" video of Brian Musselman's existence to appreciate the magnitude of his loss and the agony associated with it. Ex. 514. There are two components of this loss, one mental, one physical. No doubt his agony will not improve from a mental perspective and it is extremely unlikely to improve physically. Given the severity of Musselman's injuries and the testimony that he grieves about his condition, I find a reasonable amount of compensation for his past and future pain and suffering is $500,000.

### 5. Loss of Established Course of Life

■ 189. There is probably no greater loss, short of death, than the loss of one's dignity. Brian Musselman was an active, involved businessman, outdoorsman, and father. In the split second of an improvident moment he lost his known person and became a ward. The record in this case paints a stark contrast between who he was, and who he is. The vibrant young executive who enjoyed a mastery of the outdoors and the thrill of life is now reduced to dependent care and the tedium

of television and video. The sheer monotony of his daily existence, the tedium of his daily routine, is dispiriting. His autonomy is gone and with it the physical ability to exercise his will. I find that a reasonable sum to compensate for this horrible loss is $1,280,000. This sum gives him approximately $100,000 each year of his expected life to compensate for the deprivation of his established course of life.

## P. Devon Musselman's Damages

190. Devon Musselman was five years old at the time of her father's accident. Vol. IV 156:6–7. Devon testified at trial that she visits her father every other week at Deer Run. They play card games, talk, watch movies, and sometimes Brian accompanies her to a playground or the movie theater. Vol. IV 172:12–173:24, 175:6–12. She related to the Court that she can only ask her father yes or no questions, to which he responds by raising his foot to signify a yes answer. She stated that he smiles and makes yawning sounds to indicate he is happy. Vol. IV 174:9–175:5.

191. Lori Oberson, Devon's aunt, testified that Devon exhibited extreme outward appearances of sadness after her father's accident. Vol. IV 140:19–21. Devon became scared when any of her family members were away, and would not accept being watched by a baby sitter. Vol. IV 137:13–140:18. James Musselman, Devon's grandfather, also testified about Devon's difficulties in coping with Brian's injuries and the fact that she cannot interact with her father in the same way other people her age can. Vol. V 7:7–8:11.

192. Kim Beam, Devon's mother, testified that Devon became withdrawn, sad, and was no longer a happy kid after her father's accident. Vol. IV 157:25–158:7. Devon lost her confidence and became very dependent on Kim. She was afraid to be away from her mother for any length of time. Vol. IV 157:12–158:3. She received professional counseling for a year after the accident. Vol. IV 160:1–4. Kim's testimony painted a vivid picture of a girl who is frightened of losing her mother, and very sad to have lost her father.

193. I find Devon to have suffered a compensable injury, the loss of her father's care and companionship. There is no yardstick to measure this loss. To place a value on noneconomic damages involving a child's loss of parental consortium requires calm consideration of all the factors constituting the special bond between a father and daughter. The damages must be based on a deliberate consideration of the impact of this loss on Devon and her relationship with her father. I have taken into account her age as well as the life expectancy of her father as determined above. I have also taken into account the complex of rights encompassed in the parent-child relationship, including emotional care, comfort, guidance and society. Devon will never have a father to confide in, or to whom she can turn for advice and counsel. She will never have a father who can provide the simplest gesture of physical comfort. She will never be tickled by him nor will she delight in the joy of his laughter, or the sadness of his shared tears. She will never be scolded or complimented by him. The loss of that father-daughter relationship, the legally recognized right to have a robust, energetic and vigorous mentor and guide in life, is an extraordinary loss for Devon. I find the reasonable value of her loss to be $600,000.

## III. CONCLUSIONS OF LAW

### A. Jurisdiction & Venue

The Court has jurisdiction pursuant to 28 U.S.C. § 1346(b)(1). The accident which forms the basis of this action occurred on February 25, 1996, in Gallatin County, Montana; therefore, venue in the

United States District Court for the District of Montana, Butte Division, is proper pursuant to 28 U.S.C. § 1402(b).

■■■ The United States is entitled to sovereign immunity from tort claims unless Congress has waived that immunity via the Federal Tort Claims Act. 28 U.S.C. § 2671 *et seq.; U.S. v. Kubrick,* 444 U.S. 111, 117–18, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). According to the FTCA, plaintiffs must execute and deliver a standard form 95 or other written notification to the government along with a claim for money damages in an amount certain. 28 C.F.R. § 14.2(a). A claim for personal injury may be presented by the injured person, his duly authorized agent, or his legal representative. 28 C.F.R. § 14.3. If the agency denies the claim or fails to act on it within six months, suit may be filed in federal court. 28 U.S.C. §§ 2401(b), 2675(a). Satisfaction of this administrative exhaustion requirement is jurisdictional. *Blair v. Internal Revenue Svc.,* 304 F.3d 861, 865 (9th Cir.2002).

Plaintiffs herein filed standard form 95 with the Forest Service on February 23, 1998, within the two-year time period prescribed by 28 U.S.C. § 2401(b). Claimants are generally limited to recovering the amount of damages requested in their administrative claim. 28 U.S.C. § 2675(b). If there is more than one claimant, each must be clearly identified on the claim form and must sign the form. *Johnson v. United States,* 704 F.2d 1431, 1442 (9th Cir.1983) (affirming dismissal of spouse's loss of consortium claims for failure to make such claim and failure to sign form).

Here, counsel for the Musselman family signed the form, as authorized by law. 28 C.F.R. § 14.3(b). The form clearly requests damages on behalf of Brian Musselman, his wife Kimberlee, and his daughter Devon. The form requested damages of $40 million. Thus, I am satisfied that the jurisdictional requirements have been satisfied.

## B. Substantive Law

In cases arising under the FTCA, the law of the state where the misconduct occurred governs substantive tort liability, including the nature and measure of damages to be awarded. *Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Thus, Montana law applies here. *McCall v. United States,* 914 F.2d 191 (9th Cir.1990).

## C. Discretionary Function Exemption

■■■ The United States is immune from suit except to the extent it has waived its sovereign immunity. *United States v. Orleans,* 425 U.S. 807, 814, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976). The Federal Tort Claims Act waives the government's immunity for "tort claims, in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. § 2674. However, the FTCA reserves sovereign immunity for particular tort claims. 28 U.S.C. § 2680. When an exception under § 2680 applies, courts are without jurisdiction to hear the claim. *O'Toole v. United States,* 295 F.3d 1029, 1032 (9th Cir.2002).

Under § 2680, the government does not waive its immunity for "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The purpose of the exception is to prevent "judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of ac-

tion in tort." *Berkovitz*, 486 U.S. at 537, 108 S.Ct. 1954.

■ Although plaintiffs bear the burden of establishing subject matter jurisdiction under the FTCA, the defendant bears the burden of proving the applicability of the discretionary function exception. *Prescott v. U.S.*, 973 F.2d 696, 702–704 (9th Cir.1992). The U.S. Supreme Court has established a two-step analysis to determine whether a particular act is immune under the discretionary function exception. *Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). If either step is fulfilled, the exception does not apply and the court has jurisdiction over plaintiff's claim.

■ The United States moved for summary judgment on this issue prior to trial. I denied the motion on the first *Berkovitz* prong, citing the Forest Service's duty to investigate the Panzer accident. Having a more fully developed record before me now, I reiterate my conclusion that the government is not immune from suit in this instance, but I do so under the second rather than the first prong of the *Berkovitz* test.

■ Under the first *Berkovitz* prong, the court considers whether the government action at issue involved a choice, or was prescribed by statute, regulation or policy. *Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954. If no choice is involved, the act cannot have been an exercise of discretion and the exception does not apply. For example, *Berkovitz* was a first-prong case in which a statute required a certain action, the omission of which formed the basis of the plaintiff's claim. The Supreme Court held the discretionary function exception did not apply. *Id.* at 540–45, 108 S.Ct. 1954.

■ Even if the challenged conduct involved the exercise of discretion, it will be exempt under the FTCA only if it is the type of discretion Congress intended to shield from immunity, i.e., a decision "grounded in social, economic, and political policy." Thus, the second prong of the *Berkovitz* test looks at the choice exercised by the government, and determines whether it is based on policy considerations.

■ "It is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 813, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). On the spectrum of discretionary acts, a government employee driving a car exemplifies the type of discretion that "can hardly be said to be grounded in regulatory policy." *U.S. v. Gaubert*, 499 U.S. 315, 325 n. 7, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), while "the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals" exemplify the acts for which Congress intended to reserve sovereign immunity. *Varig Airlines*, 467 U.S. at 813–14, 104 S.Ct. 2755.

■ Most acts fall somewhere in between, creating myriad difficulties for lower courts. The case law establishes, however, that in order to be immune from suit, a discretionary act must be an "exercise of discretion *in furtherance of public policy goals.*" *Gaubert*, 499 U.S. at 334, 111 S.Ct. 1267 (emphasis added). Some of the more obvious examples of such discretionary acts include "regulatory enforcement activities," *Varig Airlines*, 467 U.S. 797, 104 S.Ct. 2755, federal regulators' takeover of savings-and-loan institutions, *Gaubert*, 499 U.S. 315, 111 S.Ct. 1267, and the selection of the appropriate design for military equipment, *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988).

■ The case at bar presents claims of negligence regarding public safety, an area of law in which courts have come to widely disparate conclusions regarding discretionary function immunity. Under the first *Berkovitz* prong, the question is whether the agency had a choice to make, or whether it was bound by statute, regulation or policy. Although plaintiffs point to numerous Forest Service manuals, a regulation must be both specific and mandatory in order to fulfill this first prong.

The claims herein are that the agency should have warned of the hill, or changed it. The Forest Service had no mandatory duty to either of those things; therefore, under the first prong of the *Berkovitz* test, the government had a choice.

The second *Berkovitz* prong looks at that choice to determine whether it is a discretionary judgment grounded in public policy concerns. A number of cases hold that failure to either correct a hazard or warn of it is not the type of discretionary judgment immunized under the discretionary function exception. *See, e.g., ARA Leisure Services v. U.S.*, 831 F.2d 193 (9th Cir.1987) (decision to design and construct park road protected by discretionary function exception, but failure to maintain road not); *Sutton v. Earles*, 26 F.3d 903 (9th Cir.1994) (failure to warn of hazard not protected by discretionary function exception); *Summers v. U.S.*, 905 F.2d 1212 (9th Cir.1990) (failure to warn of hazard not discretionary); *Seyler v. U.S.*, 832 F.2d 120 (9th Cir.1987) (failure to sign road hazard not discretionary); *Boyd v. U.S. ex rel. U.S. Army, Corps of Engineers*, 881 F.2d 895 (10th Cir., 1989) (failure to either warn of swimming hazards or prohibit swimming not discretionary). A separate line of cases appears to hold just the opposite. *Blackburn v. United States*, 100 F.3d 1426 (9th Cir.1996) (failure to warn of danger of diving from bridge discretionary); *Childers v. United States*, 40 F.3d 973 (9th Cir.1994) as amended Jan. 17, 1995, *cert. denied*, 514 U.S. 1095, 115 S.Ct. 1821, 131 L.Ed.2d 744 (1995) (failure to maintain trail in winter or warn of hazards discretionary); *Valdez v. United States*, 56 F.3d 1177 (9th Cir.1995) (failure to warn of danger of falls discretionary).

The essential factor distinguishing the two lines of cases is whether the failure to warn, or failure to maintain, arises out of "competing policy considerations." For example, the decisions involved in fighting a fire implicitly involve balancing, and are therefore exempt from suit. *Miller v. U.S.*, 163 F.3d 591 (9th Cir.1998). Similarly, when an agency fails to act because it has balanced the need for public access against the need to preserve public safety, the discretionary function exception applies. *Valdez*, 56 F.3d 1177, *Childers*, 40 F.3d 973,(failure to close trail or warn of danger on Yellowstone trail which was not maintained during the winter).

As the U.S. Supreme Court explained in *Berkovitz*, issues involving the exercise of reasonable care in maintaining government property are not immune from judicial review:

The decision in *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), also illuminates the appropriate scope of the discretionary function exception. The plaintiff in that case sued the Government for failing to maintain a lighthouse in good working order. The Court stated that the initial decision to undertake and maintain lighthouse service was a discretionary judgment. See id., at 69, 76 S.Ct., at 126–127. The Court held, however, that the failure to maintain the lighthouse in good condition subjected the Government to suit under the FTCA. See *ibid.* The latter course of conduct did not involve any permissible exercise of policy judgment.

*Berkovitz,* 486 U.S. at 538 n. 3, 108 S.Ct. 1954. Thus, the evidentiary question before me is whether the Forest Service, which bears the burden, has shown that its decision not to either correct this hazard or warn of it was "grounded in social, economic or political considerations."

In the early 1990s, the government became concerned about the increasing number of snowmobiles on West Yellowstone trails, and the increasing capacity of the machines for high speed. It weighed various public safety and resource considerations and decided to conduct a warranting process to identify hazards on the trail system. Over the next few years, it developed and implemented the process. The warranting process, which was conducted at 35 mph during the day, did not identify this hill as a hazard in 1993.

In 1996, the government implemented a snowmobile speed limit on the West Yellowstone trail system for the first time. It imposed a speed limit of 45 mph for the sole reason that adjacent Yellowstone National Park had a 45 mph speed limit on its trail system. The trail herein was warranted at 35 mph. The government failed to consider the possibility that this hill—one of the most abrupt, unsigned slopes on the entire trail system—might become a hazard under the newly posted speed limit of 45 mph. In addition, the government failed to act on the information provided to it by the Panzer accident, i.e., that a southbound snowmobiler riding at or below the speed limit at night cannot see a massive object in the trail at the bottom of the hill until reaching the crest of the hill.

The government's defense is that it had not identified the hazard of this hill, and therefore had no duty to warn of it. The analysis of discretionary function immunity does not take negligence into account, however. It merely looks at the claimed act or omission to determine whether it meets either prong of the *Berkovitz* test.

Like *Summers,* this case does not present a situation where the government recognized the hazard but decided not to warn of it because of other considerations. For instance, in *Wilson v. United States,* a five-year-old child was injured by submerged logs in a lake. 940 F.Supp. 286 (D.Or.1996). The court held the Forest Service decision not to remove the stumps from the lake was discretionary because it had to weigh public safety against disruption of the lake habitat and possible harm to creatures living there. *Id.* at 288. Moreover, it could not remove some of the stumps without removing all of them. *Id.*

In another case where the government's action was held not to fall within the discretionary function exception, the court's explanation of the difference between discretionary conduct and nondiscretionary conduct focuses on the fact that the weighing of various policy considerations had already taken place, and is not the subject of the negligence claim. Rather, it is the implementation of the plan that gives rise to plaintiffs' claim of negligence:

> The government's conduct at issue here was not the result of a policy decision about allocation of rescue resources, but rather the allegedly negligent execution of a course of action that was already chosen. At the time of the KUHUSHAN's sinking, the Coast Guard had already made the policy decision to assist the KUHUSHAN, and had communicated that decision to the crew, who in turn relied upon the Coast Guard's actions. Then the Coast Guard failed to monitor the radio channel it had instructed the KUHUSHAN to use, failed to investigate when the KUHUSHAN missed the scheduled communication check, and, apparently, forgot about the KUHUSHAN in the chaos of the evening. This is not a case where the Coast Guard decided to conserve its resources by not assisting vessels in certain situations. In-

stead, the Coast Guard decided to aid the KUHUSHAN, and then allegedly did so in a negligent manner.

*Huber v. U.S.*, 838 F.2d 398, 400–01 (9th Cir.1988). Here, the weighing of various considerations took place when the Forest Service decided to warrant the trails, and decided how it would conduct that process. These decisions are grounded in policy considerations, and are the type of discretionary decisions Congress intended to shield from tort liability.

But once the decision to warrant the trails was made, the agency had a duty to accomplish that goal with reasonable care. In the words of the Ninth Circuit, this failure to warn "resembles more a departure from the safety considerations established in service policies, akin to the situations we confronted in *Seyler, ARA,* and *Kennewick* [*Irrigation Dist. v. U.S.*, 880 F.2d 1018 (9th Cir.1989)], than a mistaken judgment in a matter clearly involving choices among political, economic, and social factors." *Summers*, 905 F.2d at 1216.

The facts established at trial bring this case wholly within the parameters of *Summers*. The government's failure to warn of the hazardous hill was not a decision grounded in public policy concerns and did not involve "competing policy considerations." It was simply an oversight, and therefore not insulated from review under the discretionary function exception of the FTCA.

■ In contrast, Plaintiffs' claim that the United States negligently designed the trail herein is immunized under the discretionary function exception. Courts have consistently held that design decisions are immune from review. *See, e.g., ARA Leisure Services*, 831 F.2d 193.

Therefore, I hold that the plaintiffs' claim that the government's failure to correct or warn of this hazard is not the type of discretionary decision that is shielded from tort liability. The Court has subject matter jurisdiction under the second prong of *Berkovitz*.

## D. Montana Snowmobile Statute

■ Montana law governs the substance of this action. 28 U.S.C. § 2674 ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."). The first element in establishing a claim of negligence is the existence of a duty from the defendant toward the plaintiff. *Gaudreau v. Clinton Irrig. Dist.*, 306 Mont. 121, 30 P.3d 1070, 1073 (2003).

■ The United States contends that the Montana Snowmobile Statute eliminates any duty on the part of the Forest Service to Brian Musselman because the statute places the assumption of all risks "inherent in the sport of snowmobiling" on the snowmobiler. M.C.A. § 23–2–654(3). The government overstates the law, however. Snowmobile area operators are still responsible for exercising ordinary care toward snowmobilers, and nothing in the statutes eliminates snowmobile operators' duty to warn of risks of which they are aware.

The Montana Legislature originally enacted the snowmobiling statutes in 1987. It has amended it only once, in 1999. The 1999 amendments inserted language emphasizing the snowmobile area operator's "duty of reasonable care," and eliminating the gross negligence standard that was held unconstitutional by this Court in *Riska v. U.S.D.A., Forest Service*, CV 96–63–BU–DWM (order filed Oct. 14, 1997). The purpose section of the statute now reads:

> The legislature finds that snowmobiling is a major recreational sport and a major industry in this state and recognizes

that among the attractions of the sport are risks, inherent and otherwise. The state has a legitimate interest in:

(1) maintaining the economic viability of the snowmobiling industry by discouraging claims based on damages resulting from risks inherent in the sport;

(2) clarifying what the inherent risks of snowmobiling are; and

(3) establishing the duties of snowmobilers and snowmobile area operators.

M.C.A. § 23–2–651 (2003). It then outlines the duties of snowmobile area operators, M.C.A. § 23–2–653, and of snowmobilers, M.C.A. § 23–2–654. The statutory section relevant herein provides:

The snowmobile area operator owes a duty of reasonable care, as required by 27–1–701, to a snowmobiler except for the risks inherent in the sport of snowmobiling.

M.C.A. § 23–2–653(2). The next section of the statute defines inherent risks of snowmobiling and places assumption of such risks solely on snowmobilers:

(3) A snowmobiler shall accept all legal responsibility for injury or damage of any kind to the extent that the injury or damage results from risks inherent in the sport of snowmobiling. Risks inherent in the sport of snowmobiling are:

(a) variations in terrain, including surface or subsurface snow or ice conditions normally occurring or resulting from weather changes, snowmobile use, or grooming or snowmaking operations;

(b) bare spots or thin snow cover caused by limited snowfall, melting, wind erosion, snowmobile action, grooming, or unconsolidated base;

(c) rocks, trees, or other forms of forest growth or debris;

(d) clearly visible or plainly marked improvements or trail maintenance equipment; and

(e) avalanches.

M.C.A. § 23–2–654(3). Finally, the statute states:

Except as provided in this section, a snowmobile area operator has no duty to eliminate, alter, control, or lessen the risks inherent in the sport of snowmobiling.

M.C.A. § 23–2–653(3). Thus, if the hazardous hill on the West Yellowstone trail system was a "variation in terrain," as contended by the government, then it was a risk inherent in the sport of snowmobiling, and the Forest Service had no duty to "eliminate, alter, control or lessen" it. It is not clear that the agency would not have a duty to warn of it, however.

Statutory interpretation in Montana is guided by a fundamental rule embodied in statute:

In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted. Where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all.

M.C.A. § 1–2–101. Thus, it is not within the Court's province to insert the word "warn" into M.C.A. § 23–2–653(3).

Although the Montana Supreme Court has not had occasion to interpret this statute, it has interpreted a similar statute designed to protect ski area operators. *Brewer v. Ski–Lift, Inc.*, 234 Mont. 109, 762 P.2d 226 (1988). The *Brewer* court held unconstitutional the portion of the skier statute that placed all risks of skiing on the skier, whether they could be eliminated by the ski area operator or not, noting that "this appears to be an attempt to go back to the old law of negligence which provided in Montana that a person who was in any way contributorily negligent was barred from recovery." *Id.* at

230. Because the Montana snowmobile statute eliminates snowmobile area operators' liability only for inherent risks, and not for their own negligence, I find that it comports with *Brewer*.

Even if the statute did provide immunity for a failure to warn, I believe the Montana Supreme Court's reasoning in *Brewer* makes it clear that an inherent risk for which an operator is immunized must be one that would be "essentially impossible" for an operator to eliminate. *Brewer*, 234 Mont. at 116, 762 P.2d 226. Moreover, this interpretation gives full effect to the statute, which was amended after *Brewer* to provide that a snowmobile area operator has a duty of reasonable care to snowmobilers except for those risks inherent to the sport. M.C.A. § 23–2–653(2). As explained by the North Dakota Supreme Court discussing *Mead v. M.S.B., Inc.*, 264 Mont. 465, 872 P.2d 782 (1994), "protecting the ski area owners from liability for their own negligence had no relationship to protecting them from liability for injuries caused by the inherent risk of skiing." *Bouchard v. Johnson*, 555 N.W.2d 81, 85 (N.D.1996).

The Utah Supreme Court's reasoning echoes that of *Brewer* and *Bouchard:*

> The term 'inherent risk of skiing,' using the ordinary and accepted meaning of the term 'inherent,' refers to those risks that are essential characteristics of skiing—risks that are so integrally related to skiing that the sport cannot be undertaken without confronting these risks.

*Clover v. Snowbird Ski Resort*, 808 P.2d 1037, 1047 (Utah 1991). The Utah court went on to observe that, "if an injury was caused by the use of ordinary care, such a hazard is not, in the ordinary sense of the term, an inherent risk of skiing" and would therefore not be one for which a ski area operator would be immunized. *Id.* Thus, "an operator's negligent or intentional acts which cause injuries are not a 'danger' necessary for the sport." *Bouchard v. Johnson*, 555 N.W.2d 81, 85 (N.D.1996).

These cases teach that, unlike the analysis of discretionary function immunity, the determination of whether a snowmobile area operator is immune due to the presence of an "inherent risk" is resolved by looking at whether the exercise of reasonable care could have avoided the injury. The seminal case establishing inherent risk involved a skier who collided with a stump that was under the snow, hidden from view. *Wright v. Mt. Mansfield Lift, Inc.*, 96 F.Supp. 786 (D.Vt. 1951). According to the *Wright* court, "there is no evidence of any dangers existing which reasonable prudence on the parts of the defendants would have foreseen and corrected.... The trail at the point of the accident was smooth and covered with snow. There were no unexpected obstructions showing. The plaintiff, in hitting the snow-covered stump ... was merely accepting a danger that inheres in the sport of skiing." *Id.*

Similarly, as the California Supreme Court explained in discussing the common law, "It may be accurate to suggest that an individual who voluntarily engages in a potentially dangerous activity or sport 'consents to' or 'agrees to assume' the risks inherent in the activity or sport itself, such as the risks posed to a snow skier by moguls on a ski slope or the risks posed to a water skier by wind-whipped waves on a lake. But it is thoroughly unrealistic to suggest that, by engaging in a potentially dangerous activity or sport, an individual consents to (or agrees to excuse) a breach of duty by others that increases the risks inevitably posed by the activity or sport itself, even where the participating individual is aware of the possibility that such misconduct may occur." *Knight v. Jewett*, 3 Cal.4th 296, 11 Cal.Rptr.2d 2, 834 P.2d 696, 705 (1992). "Thus, although a ski

resort has no duty to remove moguls from a ski run, it clearly does have a duty to use due care to maintain its towropes in a safe, working condition so as not to expose skiers to an increased risk of harm. The cases establish that the latter type of risk, posed by a ski resort's negligence, clearly is not a risk (inherent in the sport) that is assumed by a participant." *Id.*

The government's argument that any "variation in terrain" is an inherent risk of snowmobiling is undercut by taking the argument to its logical extreme. The groomed trail system could lead a snowmobiler to the edge of a cliff, then argue that it was not required to change the trail or warn users of the impending danger because the cliff was simply a "variation in terrain." It makes far more sense, and comports with the Montana Supreme Court's reasoning in *Brewer* and *Mead,* to conclude that only those variations in terrain that are either impossible to eliminate or warn of are "inherent risks."

Here, testimony established that the Forest Service was capable of changing the trail so that it curved through the trees rather than approached as a flat straightaway. Additional testimony indicated that the agency is capable of reducing the grade of the hill, and is in fact intending to do just that.

Additionally, the Panzer accident put the agency on notice that the hill was a hazard due to the inability of southbound riders to see a 10-foot tall groomer with flashing lights atop until reaching the crest of the hill. The impaired visibility, the steepness of the slope, the fact that a rider coming over the hill at the speed limit will fly 2-3 feet off the ground, and the fact that the Forest Service routinely warned snowmobilers of unexpected hazards combine to make this particular hazard one that is not inherent in the sport of snowmobiling. Placing a sign on the approach to this hill would have changed the riders' expectan-

cies and informed them that the approaching hill was far steeper than the usual gentle grade.

I therefore conclude that the Forest Service had a duty to either reduce the steep grade of this hill or warn snowmobilers of the hazards of the steep hill herein, which it breached. Further, the Forest Service's breach of its duty caused Brian Musselman's damages. I apportion 40% of the liability for Musselman's damages to the Forest Service.

### E. Brian Musselman's Negligence

■ The government contends that Brian Musselman bears sole responsibility for his injuries. As I have explained, the testimony establishes a different truth than that. Brian Musselman may have been riding fast that night; however, he was riding within his ability, and even managed to negotiate this hill safely. He was not drunk, although he had consumed some alcohol that night.

However, he did get off of his snowmobile and walk into the trail. Due to the steepness of the hill, Kalahar and Leinberger could not see him, nor could he see them. Every person has a duty to exercise reasonable care to prevent injury to himself. M.C.A. § 27-1-701. It is not clear whether Musselman could have avoided being hit even if he had stayed on his snowmobile. However, the fact remains that by walking into the trail he made himself more vulnerable to severe injury. I therefore apportion 10% of the liability for Brian Musselman's injuries to himself.

### F. Third Party Defendants' Negligence

■ Jamie Leinberger, Patrick Kalahar and Tim Johnson owed a duty of ordinary care toward one other as well as toward Brian Musselman. M.C.A. § 27-1-701. Additionally, the Montana snow-

mobile statute articulates specific duties on the part of all snowmobilers, including the duty to maintain control and speed, to heed posted warnings, and to refrain from acting in a way that could cause or contribute to the injury of someone. M.C.A. § 23–2–654. Having found that either Leinberger or Kalahar hit Musselman, and that both were impaired by alcohol and riding their snowmobiles in excess of the speed limit, I conclude that they breached their duty toward Brian Musselman.

 Although it is impossible to determine whether Kalahar or Leinberger actually hit Musselman, Montana law provides that where two or more persons commit tortious acts in concert, all are liable for the tortious acts of any one. *Sloan v. Fauque,* 239 Mont. 383, 784 P.2d 895 (1989). Moreover, even a defendant who merely encourages the commission of a tort by keeping silent while it is being committed is liable under Montana law. *Id.* at 896–97.

Kalahar and Leinberger came over the crest of the hill neck and neck, at high speeds, under the influence of alcohol. I find that they acted in concert in causing Brian Musselman's injuries. Under Montana law, they are jointly and severally liable for their portion of Musselman's damages, which I determine to be 50%.

 However, Patrick Kalahar has been dismissed by the Court and is no longer a party to this lawsuit. Under Montana law, no liability can be apportioned to a third-party defendant who has settled with the plaintiff and has been dismissed. *Cusenbary v. Mortensen,* 296 Mont. 25, 987 P.2d 351 (1999). Therefore, Jamie Leinberger is solely liable for 50% of Brian Musselman's damages.

### G. Brian Musselman's Damages

 Courts must base compensatory damages awards on substantial evidence and not on mere speculation. *John-son v. Murray,* 201 Mont. 495, 656 P.2d 170, 175 (1982); *Bjerum v. Wieber,* 149 Mont. 375, 427 P.2d 62, 66 (1967). Damages must be reasonable. *Onstad v. Payless Shoesource,* 301 Mont. 259, 9 P.3d 38, 46 (2000).

 While the plaintiff need not prove damages to a mathematical certainty, the court must have a reasonable basis upon which to estimate the damages. *Graham v. Clarks Fork Natl. Bank,* 193 Mont. 282, 631 P.2d 718 (1981); *Stark v. Circle K Corp.,* 230 Mont. 468, 751 P.2d 162, 167 (1988). Regarding damages for the future consequences of a tort, an item is recoverable if the plaintiff proves by a reasonable certainty that the future consequence would have occurred or will occur. Mont.Code Ann. § 27–1–203; *Frisnegger v. Gibson,* 183 Mont. 57, 598 P.2d 574, 582 (1979).

 In addition, courts should award damages for future medical expenses only when the expenses are reasonable and necessary. *Frisnegger,* 598 P.2d at 582. Using this framework, the court considers the individual types of compensatory damages that the plaintiff requests: pain and suffering, past medical expenses, lost wages, future lost earning capacity, and loss of established course of life. Montana law recognizes that where liability has been established an amount of money must be determined that will reasonably and fairly compensate the plaintiff for all loss caused by the defendants, regardless of whether the loss could have been anticipated. This determination includes "the reasonable value of necessary expenses to the plaintiff for any medical, surgical, hospital and other services and care and supplies, which the finder of fact determines to be reasonably certain to be required in the future in the treatment of the plaintiff, as the proximate result of the injury in question." *Johnson v. United*

*States,* 510 F.Supp. 1039 (D.Mont.1981), *rev'd on other grounds,* 704 F.2d 1431 (9th Cir.1983); *Anderson v. Burlington Northern Inc.,* 218 Mont. 456, 709 P.2d 641 (1985); *Tynes v. Bankers Life Co.,* 224 Mont. 350, 730 P.2d 1115 (1987). The award can also include the reasonable value of any purchases necessitated by the injuries.

■ The damages must include the reasonable value of lost earnings to the date of trial because of the plaintiff's inability to pursue an occupation. In determining this element of damage the court is required to consider evidence of the injured plaintiff's earning capacity, his past earnings, and the manner in which he ordinarily would have occupied his time before the injury. *Walls v. Rue,* 233 Mont. 236, 759 P.2d 169 (1988); *Putman v. Pollei,* 153 Mont. 406, 457 P.2d 776, 779–80 (1969); *Keck v. Bairs, Inc.,* 150 Mont. 562, 437 P.2d 380, 387–88 (1968).

■ When supported by the evidence the award must also include reasonable compensation for any loss of future earning capacity. *Ewing v. Esterholt,* 210 Mont. 367, 684 P.2d 1053, 1060 (1984); Mont.Code Ann. § 27–1–203. Earning capacity loss considers evidence of the plaintiff's health, physical ability, and earning capacity before the accident, and what they are now proved to be. This element of damage also takes into account the nature, extent and duration of the injuries including consideration of the incapacities the injuries cause. *Smith–Carter v. Amoco Oil Co.,* 248 Mont. 505, 813 P.2d 405 (1991); *Putman v. Pollei,* 153 Mont. 406, 457 P.2d 776 (1969); *Keck v. Bairs, Inc.,* 150 Mont. 562, 437 P.2d 380 (1968).

■ Plaintiff is entitled to an award for pain and suffering experienced before trial and reasonably probable to be experienced in the future. *Albinger v. Harris,* 310 Mont. 27, 48 P.3d 711, 721 (2002). There is no definite standard by which the measure of compensation for mental and physical pain and suffering can be calculated. Nor is there any requirement that any witness express an opinion about the amount of compensation that is appropriate for this kind of loss. The only requirement under Montana law in determining this element of damage is that it must be just and reasonable in light of all the facts proven at trial. *Id.; Werre v. David,* 275 Mont. 376, 913 P.2d 625, 637 (1996).

■ When the plaintiff has been permanently injured and where he will continue to suffer in the future from his injuries, reasonable compensation for the loss of an established course of life is a proper element of damage. *Anderson v. Werner Enterprises,* 292 Mont. 284, 972 P.2d 806, 814–15 (1998); *Frisnegger v. Gibson,* 183 Mont. 57, 598 P.2d 574, 582 (1979) It is an element of damage that is distinct from the plaintiff's loss of earning capacity and is intended to compensate for the meaningful loss of life short of death.

Applying these principles, I find that Brian Musselman's damages total $11,296,800.00 based on the following items of special and general damages:

| | |
|---|---|
| Past medical expenses | $1,008,429.00 |
| Future medical expenses | $1,394,955.00 |
| Lost earnings to trial | $1,772,604.00 |
| Lost earning capacity | $5,340,812.00 |
| Past and future pain and suffering | $ 500,000.00 |
| Loss of Enjoyment of Life | $1,280,000.00 |

Brian Musselman's damages are to be reduced by 10 percent, or $1,129,680, so that his total damages reduced by his fault equal $10,167,120. Of this, the Forest Service is responsible for $4,518,720 and Leinberger is responsible for $5,648,400.

**H. Devon Musselman's Damages**

■ Montana law recognizes a minor's right to a separate cause of action for loss of parental consortium when a parent is tortiously and catastrophically injured by a third party. *Pence v. Fox,* 248 Mont. 521, 813 P.2d 429, 433 (1991); *Keele v. St.*

*Vincent Hosp. & Health Care Ctr.,* 258 Mont. 158, 852 P.2d 574 (1993). The damages for loss of parental aid, protection, affection, society, discipline, guidance and training are recoverable only by the child. *Pence,* 813 P.2d at 433. Damages for loss of consortium must be reasonable and must take into account the nature, extent and duration of the parent-child relationship, as well as the nature and extent of the parent's injuries.

 I find that Brian Musselman's injuries are catastrophic and permanent and fall squarely within the type of compensable loss recognized by Montana law. Devon Musselman is entitled to compensatory damages in the amount of $600,000 for the loss of consortium with her father she has suffered. Because a child's loss of consortium claim is not reduced by her parent's contributory negligence as long as the parent is not more than 50% liable for his injury, Devon is entitled to 100% of her damages from defendants. *Mickelson v. Montana Rail Link,* 299 Mont. 348, 999 P.2d 985, 1003 (2000). The Forest Service is obligated to pay $266,666.67 of this amount and Leinberger is obligated to pay $333,333.33 of this amount. This reflects a proportionate allocation of Musselman's 10% fault between the Forest Service and Leinberger, with the Forest Service obligated to pay 4/9 of $60,000.00 and Leinberger being obligated to pay 5/9 of that sum.

Wherefore IT IS HEREBY ORDERED:

1. The Clerk of Court shall enter judgment by separate document in favor of Plaintiff Lori Oberson, legal guardian for Brian Musselman, against the United States in the amount of $4,518,720 and against Jamie Leinberger in the amount of $5,648,400.

2. The Clerk of Court shall enter judgment in favor of Plaintiff Kimberlee Musselman, as natural mother of Devon Musselman, against the United States in the amount of $266,666.67 and against Jamie Leinberger in the amount of $333,333.33.

3. Plaintiffs are entitled to such costs as are authorized by law.

The Clerk of Court shall notify the parties of the making of this Order.